HOUSTON & T. C. R. CO. v. ROBINS.
(No. 10456.)

Court of Civil Appeals of Texas. Dallas.
Dec. 20, 1929.

Rehearing Denied Jan. 11, 1930.

Robertson, Robertson & Gannon, of Dallas, for appellant.

S. P. Jones and Franklin Jones, both of Marshall, for appellee.

LOONEY, J. A. Robins, a brakeman in the service of the Houston & Texas Central Railroad Company in its yards at Dallas, was injured while in the discharge of duty by being knocked from the side of a box car being switched, lost his right leg, and sustained an incurable impairment of his left leg. He brought this action against the railway company for damages, under the Federal Employers' Liability Act (45 USCA §§ 51–59). At the conclusion of the evidence, defendant company moved for an instructed verdict, which was denied, and instead the court submitted to the jury all issues raised by pleadings and proof, resulting in findings altogether favorable to plaintiff, upon which the court rendered judgment in his favor. The defendant has appealed and presents for consideration only one assignment of error (others having been abandoned); that is, that the court erred in refusing to sustain its motion for peremptory instruction. The several propositions of law urged under the assignment will be discussed.

■ As the action is under the Federal Employers' Liability Act, the rights and obligations of the parties depend upon its provisions and applicable principles of common law, interpreted and applied in federal courts. Southern R. Co. v. Gray, 241 U. S. 333, 36 S. Ct. 558, 60 L. Ed. 1030, 1034.

■ The Supreme Court, in Randall v. Baltimore, etc., Co., 109 U. S. 478, 3 S. Ct. 322, 27 L. Ed. 1003, for the guidance of trial judges in acting upon motions for instructed verdicts, announced the following rule, that is to say, where the evidence given at the trial, together with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for plaintiff so that a verdict, if returned, must be set aside, the court is not bound to submit the case to a jury, but may direct a verdict for the defendant.

It is also well to bear in mind that the question of negligence does not become one of law, except where the facts are such that all reasonable men must draw the same conclusion therefrom, or, in other words, a case should not be withdrawn from the jury unless the conclusion follows, as a matter of law, that no recovery can be had upon any view which can properly be taken of the undisputed facts, or of the facts that the evidence tends to establish. Gardner v. Michigan, etc., Co., 150 U. S. 349, 361, 14 S. Ct. 140, 37 L. Ed. 1107, 1110.

■ One of the grounds relied upon by plaintiff for recovery was that defendant was guilty of negligence, per se, in that it located and maintained a switch stand, with which plaintiff's body collided, and the lead track on which the car from which he was knocked by the collision was being operated, closer together than permitted by a Texas statute, article 6559b, Vernon's Ann. Civ. St. 1925, which reads as follows: "All loading platforms and all houses and structures, and all fences, and all lumber, wood and other materials hereafter built, placed or stored along the railroads of this State, either on or near the right of way of the main lines, or on or near any spur, switch or siding of any such railroad, shall be so built, constructed, or placed that there shall be not less than eight and one-half (8½) feet space from the center of such main line, spur, switch or siding to the nearest edge of the platform, or to the wall of the building, or to the lumber, wood, or other material."

The contention of defendant is that the facts of the case do not bring it within the terms of this statute, and even if so, that it does not apply to a case brought under the Federal Employers' Liability Act.

The state statute, in our opinion, is a safety measure, designed to safeguard train operatives whose duties require them to ride on the side of cars, but whether or not the facts of the case bring it within the terms of the statute we express no opinion, for the reason that we hold that it constitutes no part of the law of the case.

It is now too well settled to admit of debate that the Federal Employers' Liability Act covers the entire field under which employers engaged in interstate commerce shall be liable for injuries to employees similarly engaged, and that the same supersedes all state and municipal legislation governing the circumstances under which the master, within the provisions of the act, shall be liable to the servant, although the act does not supersede state legislation outside the field of liability, nor does it deal with the duties or obligations of either employers or employees to the public. Chesapeake, etc., Co. v. Stapleton, 279 U. S. 587, 49 S. Ct. 442, 73 L. Ed. 861, and authorities cited.

■ Defendant company also insists that the construction and maintenance, with reference to each other, of the switch stand and lead track, on which the car from which plaintiff was knocked was being operated, present an

engineering question, and therefore that their maintenance was free from any imputation of negligence.

The following facts bear on this issue: The lead or switch track in question was constructed under the supervision of Mr. Slàborsky, division civil engineer of the Southern Pacific System, of which the defendant company is part, and was located on a strip of land that belonged to defendant, lying parallel to its main line, just east and adjoining the east main line track, and also adjoined land further east that belonged to a Mr. G. C. Brown. This land being two or three feet lower than the bed of the main line track, it was necessary, from an engineering standpoint, to fill the same to a level with the bed of the main line, and from the shoulder, of the outer edge, to slope it 1½ feet out for each foot in depth. The lead track was laid on this filled-in strip of land parallel with the main line, so that the center of the track was 9 feet from the shoulder to the fill, and at the point where the switch stand, in question, was located the tracks, that is, the main line track and the new lead track were 17.23 feet from center to center. The switch stand had no connection with the lead track, was in existence before its construction, was connected with and belonged to the main line, and was located 9½ feet from the center of the main line track. In constructing the new lead track, defendant utilized all the land it owned at that point, and, from an engineering standpoint, the new track was placed as far from the switch stand as could be safely done, without encroaching upon adjacent property which it did not own, and thus the new track was located so that it was only 7.72 feet from its center to the switch stand. No sufficient reason is suggested by the evidence why defendant could not have relocated the switch stand equidistant between the main line track and the new lead track, which, if done, would have placed it 8.61 feet from the center of each, and no reason at all is suggested by the evidence why defendant could not and did not acquire sufficient additional land on the east, either by purchase or condemnation, so as to avoid the necessity of introducing extra danger by placing the lead track close enough to the switch stand to collide with a switchman riding on the side of a passing car in the usual and customary manner of discharging his duties.

We do not think the location of the switch stand and lead track, in their relation to each other, presents an engineering question, beyond judicial inquiry, under these qualifying facts and circumstances. Section 1 of the Federal Employers' Liability Act (45 USCA § 51) provides that the common carrier, while engaged in interstate commerce shall be liable in damages to any person suffering injury while employed by such carrier in such commerce that results in whole or in part by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment. The negligence cases cited by defendant in support of its contention that an engineering question is not subject to judicial scrutiny involved the issue of assumed risk, and those decided against plaintiffs were predicated on that, among other grounds. This doctrine seems to have been introduced first in Tuttle v. Detroit, etc., Co., 122 U. S. 189, 7 S. Ct. 1166, 1167, 30 L. Ed. 1114. The contentions of the parties were stated by the court as follows: " * * * 'The first and third counts allege that bootjack siding was negligently and unskillfully constructed by the defendant with so sharp a curve that the draw-heads of the cars in use by it would pass each other, and cause the cars to crush any one who attempted to make a coupling thereon;' and this alleged faulty construction of the track was the principal matter of contest on the trial,—the plaintiff contending that the defendant was bound, in duty to its workmen and employees, to construct a track that would not expose them to the danger which existed in this case; while the defendant contended, and offered evidence to prove, that the track was constructed according to the requirements of the situation, a sharp curve being necessary at that place in order to place the cars, when loading, along-side of the dock or slip; that such curves are not uncommon in station yards." It was conceded that danger to a brakeman making a coupling on the inside of the curve existed because of its sharpness, but the dangerous situation thus created was excused, on the ground of a necessity, that is to say, that the track was constructed according to the requirements of the situation, that a sharp curve was necessary in order to place cars, when loading, alongside the dock or slip.

The court then introduced the "engineering doctrine" in the following language: "We do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved; much less that it should be left to the varying and uncertain opinions of juries to determine such an engineering question." After stating the doctrine and the reason of necessity, upon which it was based, the court proceeded to decide the case against plaintiff on contributory negligence and assumed risk.

Another case involving the question was Choctaw, etc., Co. v. McDade, 191 U. S. 64, 24 S. Ct. 24, 25, 48 L. Ed. 96, where a brakeman was killed as the result of a collision with an overhanging waterspout while engaged in discharging duties as head brakeman on a car in one of defendant's trains. Among other things, the court used the following language: " * * * The testimony makes it clear that in the proper construction of this appliance there is no necessity of

bringing it so near to the car as to endanger brakemen working thereon * * * where no necessity exists, as in the present case, for the use of dangerous appliances, and where it is a matter requiring only due skill and care to make the appliances safe, there is no reason why an employee should be subjected to dangers wholly unnecessary." Here again it was announced that an overruling necessity must exist to excuse the master when an extraordinary hazard to employees is introduced.

A more recent case is that of Southern Pacific Co. v. Berkshire, 254 U. S. 415, 41 S. Ct. 162, 163, 65 L. Ed. 335, which was a suit for damages for the death of a locomotive engineer, killed by collision with a postal crane or mail sack hanging 14 inches from the train. The court held that the engineer, who it seems was perfectly familiar with the route, was presumed to have known of the existence of the mail crane, and assumed the risk of being injured while leaning outside of his cab window. In answer to the contention of negligence on the part of the company in maintaining the postal crane dangerously near its track, the court found that a justifiable necessity existed. The court said: "In order to have uniformity the Post Office Department fixes the distance of the cranes from the equipment, and the length of the hooks, so that, in the language of a witness for the plaintiff: 'The same hook that will take a sack off a crane in Arizona or New Mexico will take it as it goes through western Kansas.' The evidence was all to the effect that this crane stood at the same distance as all the others along the road * * * the question," says the court, "is whether the railroad is liable under the statute according to the principles of the common law regarding tort. The first element in it is the standard of conduct to be laid down for the road. The standard concerns a permanent condition not only at this place, but at many places along the road and presumably at innumerable others on all the large railroads of the United States. There are no special circumstances to qualify this part of the question—which is whether or not it is consistent with the duty of a railroad to its employees to erect railroad cranes of which the end of the arm when in use is fourteen inches from the side of the train. The railroad is required and presumed to know its duty in the matter and it would seem that the Court ought to be equally well informed. It cannot be that the theory of the law requires it to be left to the uncertain judgment of a jury in every case." The court then said: "It is impracticable to require railroads to have no structures so near to their tracks as to endanger people who lean from the windows of the cars." Thus it appears that the right of the railroad to maintain postal cranes so near its passing trains as to endanger its locomotive engineers, who may lean from cab windows, was pred-

icated on a finding of fact, that it was necessary to place the equipment as was done, and that it was impracticable to conduct the business otherwise.

The Circuit Court of Appeals, in West v. Chicago, etc., Co., 179 F. 801, 803, made it perfectly clear that a common carrier, under circumstances similar to those involved here, cannot escape liability under the pretext of an engineering necessity, unless it is shown that it was impracticable for the company to have acted otherwise than was done. The court used strong language, as follows: "To erect permanent structures in such locations and relations that employees when discharging their duties are likely to be killed indicates an almost wanton disregard of human life. Under its denial the company did not conclusively overcome the prima facie showing. Such a death trap is not to be excused except by a necessity that cannot reasonably be avoided. The bridge foreman testified that when an old bridge at this location was replaced by the present one it was the intention to raise the new bridge, but the commissioners objected because the grade of the approaches would be too steep. There was no proof that the commissioners objected to the raising of the bridge if the company would also raise the approaches, nor what the cost of filling the approaches would be. A civil engineer testified that the track was upgrade both ways from the bridge and that while the clearance could be made sufficient by lowering the track 'the grade would have to be carried out so far I should say it would be impracticable.' Physical practicability was thus admitted; and, there being no evidence of how far the grade would have to be extended nor of the cost, the jury were not bound to accept an unsupported opinion that the change was financially impracticable. There was no proof to establish conclusively that the expense was beyond what a master of ordinary prudence would incur, first, out of regard for the safety of his employees; and, second, to save the damages that would accrue throughout the existence of the death trap in all cases where assumption of risk or contributory negligence could not successfully be used in defense."

Defendant has brought to our attention the recently reported case of Delaware, etc., Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578. After a careful reading of this decision, we cannot believe that it was the intention of the court to change the general understanding of the law on the subject, that is, that, before a matter may be considered an engineering question beyond the reach of court and jury, it must appear that there existed a necessity therefor, and that the thing done could not reasonably have been done otherwise. To establish a rule in the broad sense asserted by defendant, that is, that the location and maintenance of the lead track, in its relation to the switch stand, involved in

the instant case, was a matter of engineering necessity, the wisdom of which is inscrutable, without regard to the necessity or practicability of such an arrangement, would, in effect, abrogate the time-honored rule of the common law that requires the master to furnish the servant a reasonably safe place wherein to do the work required of him.

But, aside from the mere engineering feat that pertained to the proper and safe location and construction of the lead track, there existed, in fact, no necessity, because of the lack of sufficient land, for its location so dangerously near the switch stand, as claimed by defendant. The record discloses that sufficient land lying east of the strip of land on which the lead track was located was available that could have been obtained for the purpose by defendant from the owner, either by private agreement or by exercising the right of eminent domain, as authorized by title 52, art. 3264, and title 112, c. 6, art. 6336, Rev. St. of Texas 1925. It further appears from the record that the space from centers of the east main line track and the new lead track was 17.23 feet; hence the switch stand could have been located 8.61½ feet, a reasonably safe distance, from the center of each line.

It is perfectly apparent, from the cases above discussed, that there is neither statutory law, nor any doctrine of the common law, that forbids either a court or jury to try out a question of negligence involved between master and servant merely because there may be involved a matter of engineering, but the doctrine, it seems, relates alone to a condition of fact, and not to a rule of law. Bates v. Chicago, etc., Co., 140 Wis. 235, 122 N. W. 745, 747, 133 Am. St. Rep. 1069.

But it is not necessary that we base our decision on the proposition just discussed, for, even if it can be correctly said that defendant was justified, under the facts and circumstances, in placing and maintaining the new lead track in dangerous proximity to the switch stand, because of an engineering necessity, and therefore that negligence cannot be imputed to the act, still it cannot be denied that, as master, it owed the duty to warn plaintiff, its servant, of this extraordinary hazard.

In the case of McIntyre v. St. Louis, etc., Co., 286 Mo. 234, 227 S. W. 1047, 1051. brought under the Federal Employers' Liability Act (certiorari denied, 255 U. S. 573, 41 S. Ct. 376, 65 L. Ed. 792), the Supreme Court of Missouri used language pertinent here, as follows: "If, however, the necessities of the railroad company, in properly conducting its business, requires an obstruction to be placed in dangerous proximity to the track, it is not a negligent act to so place it. Morris v. Pryor, 272 Mo. 350, 198 S. W. 817; Ford v. Dickinson [280 Mo. 206] 217 S. W. 294. But owing to the dangerous character of an obstruction of that kind, a railroad company, if obliged to maintain such a structure, is negligent if it fails to give warning to its employees of its dangerous proximity to the track."

Under the Federal Employers' Liability Act, § 1 (45 USCA § 51), defendant is liable for the negligence of any of its officers, agents or employees. If, therefore, it is said that, the location and maintenance of the lead track and switch stand, with reference to each other, present, without qualifying fact or circumstances, an engineering question, it follows nevertheless that defendant, through its officers, agents, and employees, having thought out, planned, and executed the work, knew the exact position of the switch stand and lead track to each other; therefore defendant cannot escape the conclusion of fact that it knew the proximity of the track and switch stand to each other, and the lurking danger to employees whose duties required them to be engaged as was plaintiff when injured, and therefore should have warned plaintiff of this extraordinary hazard.

The evidence, in our opinion, fully justifies our conclusion and the findings of the jury to the effect that plaintiff did not know and was not chargeable with knowledge of the danger involved in riding on the side of the car in the proper discharge of duty, as he was doing when hurt, and that defendant, in failing to warn him of the danger, was guilty of negligence. See Chicago, etc., Co. v. Riley (C. C. A.) 145 F. 137–143, 7 Ann. Cas. 327; Choctaw v. McDade, 191 U. S. 64, 24 S. Ct. 24, 48 L. Ed. 96; Wilson v. New York, etc., Co., 29 R. I. 146, 69 A. 364–375; Devine v. Delano, 272 Ill. 166, 111 N. E. 742–747, Ann. Cas. 1918A, 689.

We are thus brought to consider the issues of assumed risk and contributory negligence. While these are separate defenses and have different bases, they may be considered together here, for the reason that the same facts are relied upon by defendant to support its contention with reference to each issue. Rase v. Minneapolis, etc., Co., 107 Minn. 260, 120 N. W. 360, 21 L. R. A. (N. S.) 138, and note.

The evidence bearing on these issues is substantially as follows: The plaintiff testified in substance that he was a railroad switchman of about 25 years' experience, had worked for defendant in its yards at Dallas for about 3 years, and just prior to his injury had been at work for 3 weeks (conflict in the evidence at this point, witness for defendant placed the time at 51 days), in what is known as the Proctor & Gamble industrial yards, was a member of a switching crew composed of an engineer, a fireman, a switch foreman, and two switchmen, and was engaged with the crew in bringing from the Proctor & Gamble yards, with engine and tender, a bunch of six or seven freight cars out on the new lead track; that he was at the time riding on the side of a box car, look-

ing to the south, in the direction of the switch foreman, momentarily expecting to receive a stop signal, which he was to communicate to the engineer, indicating where certain of the cars were to be uncoupled and left on the lead track; that he was facing in the direction of where the foreman was at the time, for the purpose stated, and was riding on the side of a box car with his left foot on the stirrup and his left hand holding the side grab on the car, in the usual and ordinary way for doing that kind of work, had just received from the foreman the stop signal, and was in the act of repeating same with his lantern to the engineer when he was struck by the switch stand, knocked from the side of the car, and suffered the injury complained of; that he did not know of, and had received no notice that there was, a switch stand in the yards close enough to the tracks to strike him, nor did he know that there was any danger in riding past the switch stand on the side of the car; that it was customary to give employees' notice of such a situation; that it was customary for switchmen to hang on the side of cars in the performance of such duties as he was at the time engaged; that it was not customary for defendant to have high switch stands close enough to the track for a man to be struck in passing on the side of a car; that at the time it was his duty to keep a continuous watch for the expected stop signal from the foreman in order to transmit it to the engineer that the cars might be stopped as desired upon the lead track; that he knew from experience that railroading was a dangerous employment, and, depending upon the kind of hazard, one has to be on the lookout for his own safety, and, if he fails, even for a short time, is likely to get hurt; that, where a switchman is on a new track, and does not know what to expect, it is customary for him to look ahead to make sure that there is nothing to strike him; that on this occasion he did not violate this custom, had known of the existence of this switch stand before the lead track was built, knew that it was connected with the main line, that it had no connection with the lead track and had never before ridden on the side of a box car that passed this switch stand, and did not at the time keep a lookout for possible obstructions; that while he had worked there before, and knew of the existence of the switch stand, knew it was a regular main line stand placed 9½ feet from the center of the track, knew that at night there was kept burning a light on the stand, two sides showing green and two sides showing red, which he could have seen had he looked; was familiar with the layout and location of the tracks, and up to the time he was hurt had never looked in the direction he was going, had no occasion to; that defendant maintained three kinds of switch stands, the high stand, such as the one that struck him, a stub switch stand 3 or 4 feet high, and a ball

switch stand that lays on the ground, the latter two not being high enough to strike a man riding on the side of a box car; that no high switch stand, other than the one that struck him, was maintained in defendant's yards close enough to strike a man riding on the side of a car; and that there was no reason for him to look toward the engine as they came out of the yards, but there was a reason for him to be looking for the signal.

It further appeared that the place where plaintiff was injured was not in the switching yards or near the industry of Proctor & Gamble, but was out in the open near the main line and more than 500 feet from where the switch stand of the track he was using connected with the main line. Neither the engineer, fireman, switch foreman, or the other switchman was produced or testified on behalf of defendant—hence the inference will be indulged that their testimony would have corroborated that of plaintiff in regard to matters about which they possessed common knowledge.

On cross-examination plaintiff was questioned about a conversation he had, while in the hospital, with Mr. Givins, defendant's claim agent. He was asked if he did not tell Mr. Givins that he had brushed by the switch stand on two former occasions, had nearly been knocked off, and had simply forgotten about the switch stand being there at the time he was injured. Plaintiff denied making the statement, said that Givins had visited him and sought a statement from him, which he declined to make. Bearing on this point, plaintiff was contradicted by Givins, but the conflict simply presented a question for the jury.

Mr. Herbert Fisher, assistant civil engineer for the Southern Pacific System, of which defendant company is part, testified that the standard switch stands on the Southern Pacific System, consisting of about 12,000 miles of road, are all placed 9½ feet from track centers; that the object in placing them that distance is to insure safety; that at that distance a man on the side of a car could not get hit by the switch stand.

Mr. Harry Slaborsky, division engineer for the Southern Pacific System, under whose supervision the new lead track was located and constructed, testified that there were in use various standards of switches on defendant's line; that some are placed closer to the track than others—some at a distance of 7½ feet from the center, others 8½ feet, and still others 9½ feet. The witness spoke of three kinds of switch stands—the high, the low (or dwarf), and the ground switch, used in close places—but he did not say that any high switch stand, capable of knocking a man from the side of a car, was placed closer than 9½ feet from the track center. There is therefore no necessary conflict between the testimony of this witness and that of his brother engineer, Mr. Fisher, who, evidently

referring to high stands, said they were placed uniformly 9½ feet from the track center throughout the Southern Pacific System of 12,000 miles, for reasons of safety, nor is there a necessary conflict between the testimony of Slaborsky and that of plaintiff, who spoke of there being stub or ball switches not high enough to endanger a switchman on the side of a car.

If we accept defendant's theory, that is, that it was justified because of an engineering necessity, in placing the lead track close enough to the switch stand to strike a switchman riding on the side of a box car, in the usual and customary way of discharging his duties, nevertheless it must be held that, in doing so, it introduced an extra hazard to the life and limbs of its employees, and violated its duty of maintaining a reasonably safe place for its workmen. Plaintiff, according to his testimony, was ignorant of this situation, had never been warned, and was ignorant of the lurking danger involved. Therefore, can it, and must it, be said, as a matter of law, that the danger was so obvious that it was fully known and appreciated by plaintiff? We do not think so. Defendant makes the argument that plaintiff knew of the existence of the switch stand, knew of the lead track—in other words, was acquainted with the premises; that on the night in question the beacon light on the switch stand was burning, and could have been seen by plaintiff if he had been looking. This is all true, but plaintiff, according to his testimony, had never been over this track before on the side of a car, did not know the switch stand stood close enough to the lead track to strike him while in the performance of his duties, in the usual and customary way, and such knowledge cannot be reasonably imputed to him, in view of the undisputed evidence that switch stands were placed, throughout the 12,000 miles composing the Southern Pacific System, 9½ feet, a safe distance, from track centers; therefore he had the right to assume, in the absence of notice to the contrary, that this switch stand stood the usual and customary safe distance from track centers.

The language used by Judge Pritchard in Norfolk, etc., Co. v. Beckett (C. C. A.) 163 F. 479, 482, is pertinent; he said: "That the plaintiff had seen the standpipe in question and knew its location is not disputed, but there is not a scintilla of evidence to show that he ever saw a box car pass it so as to be able to observe the space between it and the car, nor was there any evidence to show that he had ever passed it while on a box car, or that he had ever seen any one attempt to climb the ladder at a time when the car was passing this particular point. In other words, he had knowledge of the existence of the standpipe and its relative position to cars while passing it in a general way, but there is nothing to show that he had any knowledge as to the increased hazard resulting from the close proximity of the standpipe to the center of the track. In the case of Texas & Pacific Ry. Co. v. Swearingen, 196 U. S. 51, 25 S. Ct. 164, 49 L. Ed. 382, in discussing this phase of the question, among other things, it is said: "Knowledge of the increased hazard resulting from the dangerous proximity of the scale box to the north rail of track No. 2 could not be imputed to the plaintiff simply because he was aware of the existence and general location of the scale box.'"

We do not think it can be justly said that plaintiff assumed the risk of danger involved in the discharge of his duties on the occasion when hurt, in the absence of knowledge, either actual or constructive, not merely of the premises or layout of the yards and tracks, but of the danger arising at the instant he was about to pass the switch stand on the side of the box car. The undisputed facts, and facts the evidence tends to establish, in our opinion, justified the jury in finding that plaintiff was ignorant of the danger involved in riding past the switch stand on the side of the box car on said occasion. Also see West v. Chicago, etc., Co. (C. C. A.) 179 F. 801, 804; Atlantic, etc., Co. v. Linstedt (C. C. A.) 184 F. 36, 41; Illinois, etc., Co. v. Thompson, 210 Ill. 226, 71 N. E. 328, 332.

In view of this evidence and the justifiable inferences therefrom, we do not think it can be correctly said that all reasonable men must conclude that defendant was free of actionable negligence, nor that plaintiff was either guilty of contributory negligence, or had assumed the risk of the danger involved in the work he was doing.

We are therefore of opinion that the case was properly submitted to the jury, and that the evidence fully justified their findings on all issues.

Appellee suggests that this appeal is frivolous, devoid of merit, and was taken for delay, and asks that the judgment be affirmed with 10 per cent. damages, as provided in article 1860, Texas Rev. St. 1925. We cannot agree to this suggestion of appellee, and, without discussion, overrule his contention in this respect. The judgment below is affirmed, but without damages.

Affirmed.