SOUTHERN PACIFIC COMPANY, A CORPORATION, APPELLANT, v. GLADYS E. HUYCK, AS ADMINISTRATRIX OF THE ESTATE OF C. B. HUYCK, DECEASED, RESPONDENT.

No. 3351

September 2, 1942.                    128 P. (2d) 849.

*Brown & Belford,* of Reno, for Appellant.

*James A. Meyers,* of Oakland, Calif., and *Frank W. Ingram,* of Reno (*Clifton Hildebrand,* of Oakland, Calif., and *Goodman & Brownstone,* of San Francisco, Calif., of counsel), for Respondent.

## OPINION

By the Court, DUCKER, C. J.:

Plaintiff, as administratrix of the estate of her deceased husband, C. B. Huyck, instituted this action

pursuant to the federal employers' liability act, 45 U. S. C. A. sections 51–59, to recover damages for his death alleged to have been caused by the negligence of defendant. The jury returned a verdict in favor of plaintiff. Defendant has appealed from the judgment entered therein and from the order denying its motion for a new trial.

The second amended complaint includes the following allegations: "That at said time and place (April 8, 1937, Hazen, Nevada,) the defendant carelessly and negligently maintained its said track and road bed in that large timbers were laid parallel to the rails of said track and approximately two feet outside of said rails, which said timbers and rails formed ditches on both sides of said track and thereby created a trap whereby any one falling from said locomotive would be caught and crushed between said locomotive and said timbers; that the maintenance of said timbers in such position was contrary to the custom and practice of railroads in the premises, and created an unsafe place wherein to work; that at said time and place deceased fell from the gangway ladder into the ditch on the southerly side of said track and, by reason of the carelessness and negligence of defendant in the premises the said deceased was caught and crushed between said engine or tender thereof and the said timbers and was rolled in said ditch and did thereby receive injuries causing his death."

The answer denied the allegations of negligence and plead assumption of risks. Huyck, at the time of his death, was 55 years of age. He was six feet and one inch in height and weighed 215 pounds. He was an experienced trainman, having been continuously in the employ of the defendant on the Salt Lake division as a freight brakeman and conductor from July 1910 to the time of his death. He was promoted to the position of conductor in 1916. On April 8, 1937, he was conductor of a freight train operated by defendant in interstate commerce, and designated as "Extra 3748 West."

The train running westerly reached Hazen, Nevada, at about 4:40 a. m. of that day. In order to conduct switching movements the locomotive, tender, and water car were cut off from the front of the train on the main line. After finishing this work the locomotive and attached tender and car were proceeding westerly on the defendant's track designated as the N & C main line along the station platform at Hazen preparatory to picking up the train. This track, the southerly track of three in front of the Hazen station, was the nearest track to the station and located about twenty-five feet therefrom. As the locomotive approached the Hazen station platform it was slowed down to allow a brakeman to get off and line up a switch. The easterly end of the platform was approximately opposite to this switch. The platform was constructed of hard-packed gravel and terminated in a wooden curbing paralleling the rails. The distance from the outer edge of the curbing to the rails was approximately two feet. The platform and curbing were approximately the height of the rails and the space between the rails and curbing was approximately five inches deep. The bottom was about level with the ties. This type of platform is known as the curb type. Something over one hundred feet westerly from the easterly end of the platform was a crossing platform constructed of wood extending on a level from the curb across the N & C track for the passage of trucks with freight, baggage, or express. As the engine passed the switch, engineer Jackson, fireman Steiner, brakeman Baker, and Huyck were in the cab, brakeman Kelly having swung off to align the switch. The engine was running six to eight miles per hour according to Baker; approximately three to four miles per hour according to Steiner; about five or six miles according to Jackson. As the engine passed the switch Huyck was preparing to alight from the engine at the station by going down the gangway ladder on the left or fireman's side of the engine. On both sides of the engine were what are termed grab irons for hand holds.

He came out of the gangway onto the ladder backwards in the usual and customary manner, holding to both grab irons. Before he reached the bottom tread of the ladder his left foot went to the left of the ladder in the direction of the movement which caused him to lose his grip with the right hand, and his body swung in so that his back was to the west in the direction in which the engine was moving, and forward of the ladder. In this position he took two or three quick steps striving to regain his balance, lost his hold with his left hand and fell. He fell at a point approximately opposite the east end of the station building and was dragged to said crossing platform. He was picked up in a semi-unconscious condition and died later in the day. He was not seen from the time he fell until he was picked up.

██ The only question presented for determination is whether the evidence is sufficient to support the verdict. Under the federal employers' liability act, which governs this case, there is no liability in the absence of negligence on the part of the carrier. Missouri Pac. R. R. Co. v. Aeby, 275 U. S. 426, 48 S. Ct. 177, 72 L. Ed. 351. To support the verdict there must be substantial evidence produced to show that the negligence alleged in the second amended complaint on the part of the carrier was the proximate cause of Huyck's death. Defendant contends there is no such evidence to show either that the platform at Hazen was negligently constructed and maintained or that it caused the conductor's death. There was no eye witness as to the manner in which Huyck was caught by the engine or tender, or what happened after that till the body was thrown clear at the crossing platform. Necessarily, therefore, proof of these facts must have been based on circumstantial evidence. Such proof may be resorted to to furnish the substantial evidence necessary to support a verdict or judgment obtained pursuant to the federal act. Showalter v. Western Pac. R. Co., 16 Cal. (2d) 460, 106 P. (2d) 895, and federal cases cited therein.

Huyck was last seen by Steiner, the fireman, and Baker, the head brakeman, before the accident when he lost his hold on the grab iron with his left hand and fell. Concerning his descending the ladder and falling, Steiner testified:

"Q. Then after brakeman Kelly had swung off at that point, what, if anything, did Mr. Huyck do? A. He walked over on the left side of the gangway of the engine in back of my cab. Of course I couldn't see when he got in back of my cab.

"Q. Is it of metal so you can't see through it? A. I noticed the back of his legs coming down the gangway.

"Q. The gangway ladder? A. The gangway ladder, yes.

"Q. You could see his legs from your position? A. I could see his legs coming down the ladder.

"Q. When you saw him coming down the ladder, and saw his legs, just before this accident happened, what was the position of his left leg with reference to the ladder * * *? A. Well, he wasn't on the bottom rung of the ladder. He never came down to the bottom rung of the ladder. Of course, he hesitated—he got down to the fourth rung of the ladder, that is, the second from the bottom; he hesitated there. To demonstrate, he was facing this way—I will say that would be the north side—and his left leg here, he put his left leg out on the outside of the ladder. He was standing apparently—I was looking down at him from the cab. Apparently his right foot was in the center of the rung of the ladder.

"Q. You are indicating now the second rung of that ladder, the second from the bottom? A. Yes, his left foot came right out on the outside of the ladder in the direction of the movement.

"Q. That would be west? A. That would be west, yes.

"Q. Off the left-hand side of the ladder? A. Yes.

"Q. Now, with reference to his right hand, did you notice where it was at that time? A. No, I didn't

because I was looking at him from an angle, and his shoulders and his hat was in the road. I couldn't see the position of his right hand at that particular time.

"Q. Did you notice the position of his left hand? A. Yes.

"Q. Where was it at that time? A. It was on this— we might call it the front grab iron.

"Q. In other words, the grab iron to the front of the ladder?—the gangway ladder, or facing the fireman's side, it would be the hand hold to the left of the ladder? A. That is right * * *.

"Q. In other words, you were looking out from this window? A. Yes.

"Q. And then what happened, Mr. Steiner? A. Well, as—let me see—as I said, his left foot was on the outside of the ladder, and at apparently the same time he released his right hand from this grab iron. Now, I imagine he did, because I could see his shoulders swing * * * in towards the ladder.

*     *     *     *     *     *     *

"Q. The ladder was about in line with the middle line of his body as he swung in towards the engine? A. Yes.

"Q. Now, when he swung in towards the engine, what, if anything, did Mr. Huyck do with reference to his feet, or could you see what he was doing? A. I was looking down at him, and I noticed he was dragging and I noticed his right foot, the right part of his body was on the outside of the ladder. I didn't see his left side.

"Q. You didn't see his left foot? A. No, I didn't see his left foot.

"Q. Now with reference to plaintiff's Exhibit No. 2, * * * are you able to state about where it was * * * Mr. Huyck was taking those backwards steps? A. He just took maybe one or two.

"Q. Can you point out on that photograph about where it was? A. I don't know where east of the depot is there.

"Q. For your information, Mr. Steiner, the east end of the depot is indicated by this point. * * * A. I would say at just the east end of the depot is where he had the accident, where he hit the ground.

"Q. At just about that space he was taking those backward quick steps. Is that right? A. Yes.

* * * * * * *

"Q. In other words, this is the most southerly rail, and this is the area to the south of the rail. Now, with reference to that area south of the rail where would it be he was taking those backward steps? A. Well, right over here somewhere. His right foot—or—right foot would be about in here somewhere.

"Q. About in the vicinity of that timber? A. Somewhere around in there, I wouldn't say it definite.

"Q. His left foot would be to a point north of that position, is that correct? A. Well, I didn't see his left foot hit the ground. * * *

"Q. Well, let's put in this way. His right foot, where you could see it, about at the vicinity of that timber, you didn't see his left foot beyond that point? A. I didn't see his left foot."

Baker's version of the manner in which Huyck descended the ladder and fell, corresponded in the main with that given by Steiner. He testified in part:

"A. Well, I was standing in the gangway looking down on top of him, and his foot, his left foot, was outside of the ladder here, and his right hand was up there, and just his foot was outside here—his right hand had lost hold."

* * * * * * *

"Q. How was he? In other words, was his body completely straight at the ladder or was he leaned over somewhat at the top towards the left-hand hold? A. There was a little tendency to be a little towards the left hand side.

"Q. After his right hand had come loose from the hand hold on the right hand side here of the gangway, tell us then what happened. A. Well, this foot—as his

feet both went on the ground there he took three or four steps while he was holding onto this grab iron on the cab side, trying to get his balance.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. And what direction was he facing when he was taking those three or four quick steps? A. He was facing towards the rear of the engine.

"Q. Towards the tender, is that right? A. Towards the tender, yes.

"Q. His back would be in what direction then? A. To the—towards the head of the engine.

"Q. His left hand was still on the left hand hold there; that is, on the hand hold shown on the left-hand side of 'Plaintiff's Exhibit No. 5'? A. Yes.

"Q. Now, with reference to this space in between the beam on the front of the tender—that is the tender beam, there isn't it; the front end of it? A. Yes, sir.

"Q. Now, with reference to this space in between that and this left hand hold, where was Mr. Huyck's body before his hand left that hand hold, left hand? A. I would say he was backing up taking those steps trying to get his balance.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"A. His body was just west ahead of the ladder.

"Q. With reference to the rail, the left-hand rail here, where abouts was he? A. Well, I couldn't tell you. He was just walking outside of wherever this would be on the ground. I couldn't say how far out.

"Q. Well, at the station there at Hazen, do you remember the construction of the station platform there; that is, as to whether the platform comes completely out to the rail or whether there is a ditch there? A. No, there is a ditch there.

"Q. Now, that ditch extends out to the south of the rail how far? A. I should judge about to the end of the ties.

"Q. Well, anyway, it is shown there in the exhibit, is that correct? A. That looks like it, yes.

"Q. Now with reference to that ditch, about where was Mr. Huyck's body at the time you saw his left hand still hanging to the left hand hold and saw him taking those quick steps? A. I couldn't tell you exactly where he was, only he was taking those steps and I was just watching him. I didn't pay any attention to where his feet was when he was taking those steps.

"Q. Was his body outside of the ladder here or was it closer to the engine, in between the hand-hold and the left-hand side of the ladder? A. It was just forward of the ladder here, taking those steps. Now, whether it was closer in or not, I couldn't say. * * *

"Q. Referring to Plaintiff's Exhibit No. 2 here, and ask you with reference to that exhibit, about where was it that Huyck's body left the locomotive? A. I should judge right about in there. Approximately right about here.

"Q. You are indicating the left-hand part of the photograph; that is Plaintiff's Exhibit No. 2, in the lower left-hand corner? A. Yes.

"Q. Where would be the end of the first tie, approximately, that is shown in that exhibit, is that correct? A. Approximately right in there."

On cross examination he said:

"Q. I see, now—and he had hold of that rear grab iron with his right hand and the forward grab-iron with his left hand, is that correct? A. Yes.

"Q. And as he was standing there, on what rung of the ladder were his feet, if you recall? A. Well, I couldn't tell you exactly whether they were—all I could see was this one was outside. Now, whether his right one was on this rung here of the ladder I could't tell you.

"Q. The right foot outside? A. The left foot.

"Q. The left foot. Pardon me. When we say 'outside,' we mean his left foot was forward, or west of the forward or west end of the ladder? A. Yes.

"Q. In Exhibit No. 5? A. Yes.

"Q. What did you next observe, Mr. Baker? A. The next thing I observed was that his right hand had let go of this grab iron on the tank, and when it did, well, both feet were on the ground, and he still had hold with his left hand of the grab iron on the cab, and he was taking these steps to try to catch his balance, for he was going backwards, off balance, and then when his left hand lost hold I see him disappear, and when he let go I jumped back to Jackson and told him to big hole it. (Meaning to apply the brakes.)

\*    \*    \*    \*    \*    \*    \*

"Q. Now, Mr. Baker, if a man was standing on the locomotive, with a locomotive proceeding westerly in the direction it was proceeding, and a man were getting off the ladder in the usual, normal manner, with which hand would he let go first. A. He would let go with his right hand—his left hand first.

"Q. His left hand first. That was to swing out? A. Yes."

Mr. Steiner, the fireman, also testified as follows:

"Q. Mr. Steiner, I want to ask you another question or two with reference to the point where Mr. Huyck left the engine. Was there any marks, physical marks along there to indicate how far he had been dragged? A. Well there was some dust. Yes, some dust in the gravel outside the curbing.

"Q. And about how long did that extend? A. About fifty-one feet, somewhere within there.

"Q. Was there any marks on the bottom of that arch bar? That is this part that is shown here in Plaintiff's Exhibit No. 4. Was there any marks on the bottom of the arch bar that you observed after this accident happened? A. Well, it looked like there was— there is grease on the bottom of those strips and it did look like there was a little dust had been brushed off it, like there was a little dust, the grease wasn't brushed off.

"Q. Normally, Mr. Steiner, where would the bottom

of this arch bar come with reference to that area between the track and the curbing? That is, outside the railing? Would it be about half-way in between or just how? A. I don't know the exact measurements on that, but I would say that it would be about just even with the curbing, maybe just outside a little.

"Q. With reference to the track, the outside of that arch bar would be out how far? A. Oh, about sixteen or seventeen inches, I imagine.

"Q. From the track? A. Yes.

"Q. And with reference to the ladder, the gangway ladder, that arch bar, Mr. Steiner, would the outside surface of it be outside the ladder or be inside the ladder? A. It would be inside the ladder.

"Q. On the inside where the position of the ladder went down."

■ This testimony and all the circumstances of the accident were ample to warrant the conclusion that the curb platform at Hazen was the proximate cause of the death of plaintiff's intestate. As previously stated, there was no eye witness to the manner of his death. The cause rests as it may on circumstantial evidence. In this connection defendant suggests that the fatal injuries of the conductor may have been caused by his head striking the ground or the arch bar. The jury, having substantial ground on which to form a contrary conclusion, was entitled to reject these theories. There is not a scintilla of evidence to sustain either suggestion. The jury could have fixed the speed of the engine at three miles per hour and Huyck, as the testimony shows, did not fall sheer from any height. His feet were on the ground and he was off balance. Under such circumstances it is extremely unlikely that he could have struck the ground with sufficient force to have caused the fatal injuries. As to the arch bar, his feet were towards it and he was going backwards from it. Moreover, the momentum of the engine would have thrown him from the arch bar instead of towards it, or to the bottom of

the ladder. There was no indication that his body struck the top or front part of the arch bar, whereas there was evidence that it was in contact with the lower part of the arch bar and was dragged along between the curbing and the rails to where it was found. The bottom of this arch bar, which was on the head truck of the tender of the engine, extended half way across the trench and was seven and one half inches from the bottom thereof. These circumstances were all for the jury, and their conclusion as to the proximate cause was a reasonable one. It is not opposed by any inconsistent inference equally reasonable.

The court in Showalter v. Western Pac. R. Co., 16 Cal. (2d) 460, 106 P. (2d) 895, 905, quoted approvingly from the opinion of the court in Wabash Screen Door Co. v. Black, 6 Cir., 126 F. 721, as follows: "Doubtless a jury ought not to be permitted to speculate, in the sense of guess, between causes, when no reasonable explanation of the injury can be found in the testimony. * * * But, in the absence of direct testimony, the simple suggestion of theories by the defense does not reduce the jury to mere speculation, and disqualify it from determining the cause of the injury complained of. The theories suggested may be forced and fanciful, finding no reasonable foundation in the facts proved. They may be explanations which do not explain; which the common sense of the jury, when applied to the testimony, would instantly reject."

We are in accord with that statement. Moreover, had defendant's suggestions as to the cause of death a more rational basis they would not necessarily invalidate the verdict. They would have furnished merely argument to be presented to the jury. Weiand v. Southern P. Co., 34 Cal. App. (2d) 500, 93 P. (2d) 1023.

■ When the proof as to a vital fact is circumstantial it is only "where the evidence tends equally to sustain either of two inconsistent propositions that neither of them can be said to have been established by legitimate proof." Showalter v. Western Pac. R. Co., supra. See

Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, and cases cited on page 339, 53 S. Ct. 391, 77 L. Ed. 819. Such is not the case here. So much for the sufficiency of the evidence as to the proximate cause.

Now as to the question of negligence. The charge is specific and the issue, succinctly stated, is whether the platform at Hazen was so negligently constructed and maintained as to create a trap in which plaintiff's intestate was caught and crushed to death. It was the duty of defendant to use due care to provide a reasonably safe place for the use of trainmen in its employ. Seaboard Air Line R. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Ames v. Western Pac. R. Co., 48 Nev. 78, 227 P. 1009. We have heretofore described the physical condition created by the platform and rails which, for convenience of reference, will be called the trench. Photographs of the same were introduced in evidence, which show that the side of the curbing towards the rail was flat and not curbed or sloping, as the name might imply. The record discloses that there were three types of platforms in use by the defendant and other railroad systems, the curb type of platform as at Hazen, where the space between the curb and the rail is not filled in, and the rail high and tie high platform where there is no depression between the platform and ties or rails. A great deal of testimony was introduced pro and con as to relative merits of these platforms, their comparative safety and utility and relative use. An extended review would serve no useful purpose and only prolong this opinion. It is enough to say that the jury could well believe from this testimony that an accident like the one in the instant case would have been less likely to happen at either of the other two types of platforms where there was no ditch or trench as at the Hazen platform. They could reasonably believe that with the engine travelling at the slow rate of speed testified to that if either of the other types had been

installed at Hazen, Huyck would have had an opportunity to roll to safety. On account of the depth of the trench and the sheer wall of the curb, no such opportunity was afforded him. It was within the province of the jury, therefore, to find that the curb platform at Hazen was unsafe. In fact, the event proved conclusively that it was unsafe. And the fact that other types that were safer to an employee were in use at other depots, shows that the curb type was unnecessary even though such platforms might be more convenient for rail inspection, as testified to by witnesses for defendant. Moreover, there was evidence tending to show that depth of the trench had been lessened since the accident. We are of the opinion that the evidence was sufficient to warrant a determination of the issue as to negligence in plaintiff's favor.

■ On this question of negligence defendant contends that it was established without contradiction that the curb type of platform was a standard type, not only on the lines of defendant, but on the lines of practically every major railroad in the United States. In this connection it must not be understood that we hold that the standard type of curb platform in use by defendant and other railroads is unsafe. Our decision goes to the curb platform at Hazen on April 8, 1937. As previously stated, there was evidence tending to show the depth of the trench had been lessened since the accident. And one of defendant's witnesses, a civil engineer in the employ of the Santa Fe Railroad, testified to a very material change since the accident, in that at the time of the trial the rail was two and a half to three inches higher. At the time of the accident the rail was level with the curb installation. From these circumstances the jury was at liberty to infer that the platform at Hazen at the time of the accident was not satisfactory to defendant, and did not conform to the standard type of curb platforms.

Defendant stresses the contention that plaintiff failed

to prove that part of the charge that the maintenance of the platform at Hazen was contrary to the custom and practice of railroads in the premises. There was evidence introduced tending to show this, but whether it is sufficient to support a finding we need not say as that part of the charge was not necessary to its sufficiency, and the failure of proof thereon, if there was such failure, is immaterial.

The defendant contends that the construction and maintenance of the curb platform at Hazen was an engineering problem and being such was not a jury question. In support of this contention cases are cited to the effect that carriers have much freedom of choice in providing facilities and places for use of their employees and where established in accordance with reasonable and scientific judgment on road beds and yards, are not subject to review by a jury. Toledo, St. L. & W. R. R. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed 513. An extended examination of the cases bearing on this question reveals that the rule contended for, where applied or recognized, is deemed to rest upon the necessities of the situation. It is believed to be essential to its application that the facility or place of use of an employee must be suitable and necessary for the practical operation of the employer's business. Kreigh v. Westinghouse, Church, Kerr & Co., 214 U. S. 249, 29 S. Ct. 619, 53 L. Ed. 984; Texas & Pac. Ry. Co. v. Swearingen, 196 U. S. 51, 25 S. Ct. 164, 49 L. Ed. 382; Choctaw, Oklahoma, etc., R. R. Co. v. McDade, 191 U. S. 64, 24 S. Ct. 24, 48 L. Ed. 96; Union Pac. R. Co. v. O'Brien, 161 U. S. 451, 16 S. Ct. 618, 40 L. Ed. 766; Kreitzer v. Southern Pac. Co., 38 Cal. App. 654, 177 P. 477; Haskins v. Southern Pac. Co., 3 Cal. App. (2d) 177, 39 P. (2d) 895; Ford v. Dickinson, 280 Mo. 206, 217 S. W. 294; Houston & T. C. R. Co. v. Robins, Tex. Civ. App., 23 S. W. (2d) 461; Taber v. Davis, 2 Cir., 280 F. 612; Werner v. Illinois Central R. Co., 309 Ill. App. 292, 33 N. E. (2d) 121.

In Kreigh v. Westinghouse, Church, Kerr & Co., supra [214 U. S. 249, 29 S. Ct. 622, 53 L. Ed. 984], the court said:

"Where workmen are engaged in a business more or less dangerous, it is the duty of the master to exercise reasonable care for the safety of all his employees, and not to expose them to the danger of being hurt or injured by the use of a dangerous appliance or unsafe place to work, where it is only a matter of using due skill and care to make the place and appliances safe. There is no reason why an employee should be exposed to dangers unnecessary to the proper operation of the business of his employer. Choctaw, Oklahoma, etc., R. R. Co. v. McDade, 191 'U. S. 64, 66, 24 S. Ct. 24, 48 L. Ed. 96, 99, and cases there cited."

In the case last referred to a brakeman in the employ of the company was killed while engaged in the discharge of his duties on one of the company's trains, by being struck by an iron spout of a water tank located near the track. It was found that there was no necessity for bringing this appliance so near to the car as to endanger brakemen working thereon. On this phase of the case the court said [191 U. S. 64, 24 S. Ct. 25, 48 L. Ed. 96]:

"It is undoubtedly true that many duties required of employees in the transaction of the business to be carried on by a railroad company are necessarily attended with danger, and can only be prosecuted by means which are hazardous and dangerous to those who see fit to enter into such employment. Where no necessity exists, as in the present case, for the use of dangerous appliances, and where it is a matter requiring only due skill and care to make the appliances safe, there is no reason why an employee should be subjected to dangers wholly unnecessary to the proper operation of the business of the employer." Citing Kelleher, Adm'r v. Milwaukee & Northern R. R. Co., 80 Wis. 584, 50 N. W. 942; Georgia Pac. Ry. Co. v. Davis, 92 Ala. 300, 9 So. 252, 25 Am. St.

Rep. 47; 1 Sherman & Redfield on Negligence, 5th Ed., sec. 201 and cases cited.

It was decided in Texas & Pacific Ry. Co. v. Swearingen, supra [196 U. S. 51, 25 S. Ct. 168, 49 L. Ed. 382], that the switchman in the employ of the company had not assumed the risk by striking against a scale box in close proximity to a switch track. But the court, in the course of its opinion, said:

"Prima facie, the location of scales where the tracks were only the standard distance apart, and where a space of less than 2 feet was left for the movements of a switchman between the side of a freight car and the scale box, encumbered, as he would be in the nighttime, with a lantern employed for the purpose of signalling, did not incontestably establish the performance of the defendant company of the duty imposed upon it to use due care to provide a reasonably safe place for the use of the switchmen in its employ. And so far from the proof making it certain that the necessity of the situation required the erection of the structure between tracks Nos. 1 and 2 as existing there was proof that the railway company owned unoccupied ground, intended for other tracks to the south of track No. 4, justifying the inference that the distance between tracks Nos. 1 and 2 might have been increased, and the employment of the scales thus rendered less hazardous to switchmen, or that the scales might have been removed to a safer location.

"It was therefore, properly a question for the determination of the jury whether or not the scales were maintained in a reasonably safe place. * * *"

In Werner v. Illinois Central R. Co., supra [309 Ill. App. 292, 33 N. E. (2d) 126], the plaintiff, had been injured because of the proximity of a dwarf signal to the track, and was permitted to recover for his injuries. The court said: "No practical necessity existed for the maintenance of the dwarf signal in the position it was in at the time of the accident. It is undisputed that

384

with very little cost the signal could have been moved or lowered without destroying its practicability and more important, if the location of the signal had been changed as suggested, the dangerous and unsafe condition would have been eliminated." Cited: Texas & Pac. R. Co. v. Swearingen, supra, and Choctaw, Oklahoma, etc., R. R. Co. v. McDade, supra.

The doctrine of engineering necessity, so much relied on by defendant, was, as pointed out in Houston & T. C. R. Co. v. Robins, supra, first announced in Tuttle v. Detroit, etc., Co., 122 U. S. 189, 7 S. Ct. 1166, 30 L. Ed. 1114, cited by defendant. Other cases in which it was involved were discussed in the former opinion and it was shown that adherence to the doctrine is put on the ground of necessity. As stated in the former case [23 S. W. (2d) 465], "There is neither statutory law, nor any doctrine of the common law, that forbids either a court or jury to try out a question of negligence involved between master and servant merely because there may be involved a matter of engineering, but the doctrine, it seems, relates alone to a condition of fact, and not to a rule of law." Bates v. Chicago, etc., Co., 140 Wis. 235, 122 N. W. 745, 747, 133 Am. St. Rep. 1069.

█ If the law were otherwise, the court further observed, it would "abrogate the time-honored rule of the common law that requires the master to furnish the servant a reasonably safe place wherein to do the work required of him." We agree with the former court in its analysis of the recent case of Delaware, etc., Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 204, 73 L. Ed. 578, also cited by defendant herein, where it said, "After a careful reading of this decision, we cannot believe that it was the intention of the court to change the general understanding of the law on the subject, that is, that, before a matter may be considered an engineering question beyond the reach of court and jury, it must appear that there existed a necessity therefor, and that the thing done could not reasonably have been done otherwise." This is indicated by the following statement in

the course of the opinion in Delaware, etc., Co. v. Koske, supra: "There is no evidence that the open drain was not suitable or appropriate for the purpose for which it was maintained or that there was in use by defendant or other carriers any means for the drainage of railroad yards which involve less of danger to switchmen and others employed therein." We are of the opinion that the rule of engineering necessity contended for can have no application to the facts of this case.

It is insisted that plaintiff's intestate assumed the risk in alighting from the locomotive. We do not think so. It was not one of those risks incident to the defendant's business. It arose out of its negligence as found by the jury, and the question presented was whether the risk was actually known to him or so patent as to be readily observed by him, that he should be presumed to know of it. Chicago, M. & St. P. Ry. Co. v. Donovan, 8 Cir., 160 F. 826; Choctaw, Oklahoma, etc., R. R. Co. v. McDade, supra; Texas & Pac. Ry. Co. v. Swearingen, supra; Seaboard Air Line R. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Ames v. Western Pac. R. Co., 48 Nev. 78, 227 P. 1009. In the case last cited this court, on ample authority, stated and applied the above rule. The trial court properly instructed the jury on this phase of the case.

There was no evidence tending to show that Huyck was conscious of the danger, and the circumstances were sufficient to take the question of his presumed knowledge to the jury. Its finding in this respect is conclusive. True, there was testimony showing that in his capacity of conductor he had passed by the platform on his train many times for a number of years, and that he was seen on occasions during waits of his train, standing around the platform, but there was nothing in the nature of the platform to particularly attract his attention and warn of danger. The risk was not plainly evident. On the other hand it was somewhat obscure. It was not open or glaring, but more of a latent danger

which only an accident or a close inspection could fully expose. The jury was entitled to view it in this light, the burden being on defendant. The situation was not like that in Delaware, etc., R. R. Co. v. Koske, supra, relied on by defendant, in which the injured party was held to have assumed the risk. In that case it appeared that the plaintiff employed in the defendant's round-house and coal-chute yard alighting from an engine in the nighttime in the course of his employment, fell into an open ditch used to drain the yard. He was familiar with the ground in this yard, having worked there for eleven years, one year of which was in the daytime. He knew, of course, that the ditch was there and its proximity to the engine from which he stepped, having been under his close observation during those years. He knew, or should have known, that to step into it from a moving engine would likely cause injury. The set-up there was quite dissimilar to the place of the accident in the instant case. The danger, if not known, was plainly observable.

We deem it unnecessary to discuss other cases cited by defendant to this point.

The judgment and order denying defendant's motion for a new trial should be affirmed.

It is so ordered.

### ON PETITION FOR REHEARING

October 19, 1942.

*Per Curiam:*

Rehearing denied.