(No. 20678.—

FREDERICK A. AUSCHWITZ, Defendant in Error, *vs.* THE WABASH RAILWAY COMPANY, Plaintiff in Error.

*Opinion filed October 23, 1931—Rehearing denied Dec. 3, 1931.*

HAY & BROWN, and LEESMAN & ROEMER, for plaintiff in error.

ROYAL W. IRWIN, for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

Frederick A. Auschwitz recovered a judgment in the superior court of Cook county against the Wabash Railway Company for $20,000 in an action on the case for personal injuries received on November 13, 1926. The Appellate Court for the First District affirmed the judgment, and the record has been brought before us in answer to a writ of *certiorari*.

The declaration was in four counts. The court instructed the jury that there could be no recovery on the third count. No cross-error having been assigned, no question arises on that count.

The plaintiff was a locomotive engineer employed by the defendant in interstate commerce and the suit was under the Federal Boiler Inspection act. The first count alleged that the defendant carelessly and negligently furnished, provided and maintained the tender of the locomo-

tive for the plaintiff's use in a dangerous and defective condition, in that a certain step attached to the rear end of the tender was twisted, bent and broken and was improperly and dangerously bent out away from the tender so that there was danger of the same fouling or striking against persons along and beside the track and rails as the locomotive and tender proceeded over them. The second count charged that the defendant failed to maintain the tender and its parts in proper condition and safe to operate and that the step "was bent, twisted and out of place and the same then and there improperly extended out beyond the outside of said locomotive and tender." The fourth count charged that the defendant furnished, provided and maintained the tender and its parts in an improper condition and unsafe to operate, in that the step was bent and twisted and extended out too far away from the side of the tender; that the plaintiff complained to the defendant about the "dangerous and defective" step, and thereupon the defendant promised that the "defective" step would be "remedied, repaired, fixed and rendered safe to use," and ordered the plaintiff to use the tender with the "defective and dangerous" footboard, and ladder attached thereto, until it could be repaired. The dangerous condition relied on by the third count was furnishing, producing and maintaining a certain wooden platform in a wet, greasy and slippery condition. The plea was the general issue.

Each of the counts alleged that the plaintiff, in the exercise of due care for his own safety and in the performance of his duties, got off the locomotive as it was slowly proceeding over the track and was struck by the step and thereby thrown upon the track and run over by the cars attached to the locomotive.

The Federal Boiler Inspection act provides: "It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in

proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28, 29, 30 and 32 and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." (45 U. S. C. A. 79, sec. 23.) This act conferred on the Interstate Commerce Commission power to specify the sort of equipment to be used on locomotives in interstate commerce, and this power is exclusive of the power of the States. (*Napier* v. *Atlantic Coast Line Railroad Co.* 272 U. S. 613.) In the exercise of this power the commission had made an order in regard to sill-steps, which was in force at the time of the accident by which the plaintiff was injured, as follows: "Tender sill-step, steam locomotives, used in road service. Number, four on tender. Dimensions, firm tread not less than 8 by 12 inches metal (may have wooden tread). If stirrup steps are used, stirrup length of tread shall not be less than 10, preferably 12, inches. Location, one near each corner of tank on side."

The plaintiff testified in his own behalf and offered no other evidence. His testimony was that he was first employed by the Wabash in 1895 and from that time continued in its employment until his injury, on November 13, 1926. For about eight weeks before he was hurt he had been engineer on trains 70 and 71, operating between Bement and Forest, making the trip one way one day and back the next day, except Sunday. While he had this run from Bement to Forest he left at 7:50. During the two months he had been on that particular run he had a twenty-hundred class engine; most of the time the same engine but once in a while another one. At different times during this time he had other engines. They were all of the twenty-hundred

class. He believed he had a seven-hundred one trip. The night before the accident he was over in the hotel when his foreman came over and told him that he was going to get another engine in the morning. His name was Frank Bohn, and he was in charge of the machinery department at Bement and had charge of the engines. He saw that they went out on time, and he had three or four men working for him, cleaning fires and things of that kind. It was the foreman, Bohn, who gave him the engine he was to use. He causes the repairs to be made on the engines. The plaintiff was at the hotel in Bement when Bohn came to him and said, "If you have got any extra equipment on the engine you had better take it off, because I am going to give you another engine in the morning." The next morning the plaintiff went over a little earlier than usual. He got there about 6:30 in the morning and said to the foreman, "What engine do I get?" and the foreman said, "That one standing over on that track—on the south-bound track." It was the 874. It is what is called F-7—the eight-hundred class. The plaintiff had not worked on that engine during the two or three years before he got hurt but he had on some similar to it. He got work on those engines between Chicago and Decatur. He had the 806 regularly for two or three years but never worked on the 874 before this time. The F-7 engines are built similar. The 874 was equipped with a foot-board back of the tender, running from one side of the engine tender to the other. It was used as a local freight engine and for switching and everything else. A local freight engine is a run that does all of the local work between designated points and does the local switching and passenger also. Those particular engines are built with a foot-board on the rear of the tender. That foot-board is about six inches above the rails and some of them are twelve or fourteen inches wide. He never measured this particular one but supposed it was about twelve or fourteen inches wide, made of wood. They used a big,

heavy plank on that, about an inch and a quarter or an inch and a half thick, according to his judgment. The plank did not go out as far as the outside edge of the tender. It just barely came flush. There was a grab-iron running on each side from top to bottom of the tank, at the corner. There was another step on the rear end, on the side of the tender—that is, right on the outside of the corner of the tank, probably six or eight or ten inches from the back end of the tank, fastened onto the sill of the tank, and the sill is right flush with the outside of the tank, the tank coming even with the sill. The sill is the structure on which the tank rests. Some of them used to be made of wood, and when they went into the shop they put a steel frame on them. There are two hangers to which the step is fastened. They are made of malleable iron, about eighteen inches long, and vary in thickness from one-fourth to three-eighths and some of them one-half inch thick—some thicker—and about two inches wide. By eighteen inches long he meant where it was fastened onto the tank to go down to where the step is. The tops of the hangers come under the sill there and are bolted on with two bolts. The bottom bends out and generally comes flush with the board, which is supposed to be eight inches wide. He meant when this bar came flush with the board it was bent out underneath so that the board rests on top of it and is bolted on with two bolts, two on each hanger. The bar comes out past the bottom part. There are four bolts. The steps are twelve to fourteen, sometimes fifteen, inches long. On the morning going out it looked like the board on that particular engine was about eight inches wide, but it was bent out. The width from the inside to the outside of it was eight and one-half inches and the length about fourteen inches. He had used engines with steps just like it. When he went over to the round-house on this morning the foreman pointed out this engine to him. He changed his clothes and got an oil can ready and started to oil around and get

ready for the trip. That was around 6:45. When he got to the rear end on the right side he discovered the step, the hangers on it bent out. The hangers hang straight up and down, perpendicular. On account of being eighteen inches long something must have bumped up against them. Instead of hanging down straight they were projecting out—bulging out. They looked to be seven or eight inches out of line, leaning slightly toward the rear as well. The board that was on the bottom of the step as he looked at where the step was bent, bent outwards, with its outside edge slightly elevated. The bolts are countersunk in the wood in order that the brakeman will not catch his foot on the step and to make it flush with the step. When he saw the step in that position he went over and reported it to the foreman, Bohn. He asked him if he knew the step was in that condition. Bohn went out and looked at it and said, "It is not so bad as you said it was; go ahead and take the engine out." The plaintiff said, "It would be advisable for you to get that fixed to-day, because I am afraid the train crew won't take it out; they will refuse to take the engine out and I will have to bring it back, and you will have a delay on the train anyway." Bohn said he wanted to avoid a delay on the train. The plaintiff told Bohn "somebody might get hurt with it and then you and I will get into it." Bohn said "it was not so bad. They went out worse than that before and there was nothing said about it. Go ahead and take it and we will have it fixed at Forest." Forest is at the end of the line and there is a repair shop there. The plaintiff said, "I don't like to do it, but if you want it to go out that way I suppose I will have to take her out." He said, "Go ahead and take her out." The plaintiff went out and got coal and water at Bement and coupled on the train and left, proceeding north with his train from Bement toward Forest, picking up and leaving freight as required at the various stations, and had reached Mansfield, where the line extending north and south was crossed

by a line of the Big Four extending east and west. At Mansfield, south of the Big Four, the carload freight had been attended to and nothing remained to be done there except to pick up the way-freight, which was in the station used for that purpose, just north of the Big Four and west of the Wabash. That operation was expected to consume fifteen or twenty minutes. The plaintiff and his fireman, when the switching had been done and the engine and train were south of the Big Four, turned the engine over to two other employees to operate while the way-freight was being handled and prepared to leave the engine at or about the station platform, which was in the northeast corner made by the crossing of the two railroads. They were going to get a lunch. The engine, under the control of the other two employees, proceeded north at a speed of five or six miles an hour. The fireman got safely down just before the engine reached the crossing and the plaintiff followed, stepping down the gangway between the engine and tender to the platform a short distance north of the crossing. The platform there was of wood and was wet from a rain which had fallen a short time previously. As he stepped down his right foot slipped in the direction in which the train was going, leaving a mark which some of the evidence tended to show curved toward the track. He put his left foot down quickly and that slipped also and he went down on all-fours. He testified that he was on both hands and both feet, facing north, (the direction in which the train was going,) his hand and foot nearest the edge of the platform being about two feet from the edge. He started to raise himself up, when he was struck in the back. As a result of the blow he was knocked under the train and his feet were run over by the front trucks of the first car. He did not see what struck him. This was all the evidence for the plaintiff.

George E. Beale, who was employed by the defendant at Mansfield, was standing by the freight station, east of

the track, about twenty or twenty-five feet from where the plaintiff fell, watching to check the numbers of certain cars which he expected to be right behind the tender, and saw the plaintiff come down the gangway from the engine and step down to the platform and fall between the rail and platform. Beale turned and gave the stop signal to the engineer, then turned back and saw the journal box on the front car immediately behind the tender strike the plaintiff and turn him over several times. After the fireman, George Stump, had got safely off the engine he proceeded, as he testified, to the platform, and as he started to turn to the east toward the lunch room he looked back to see if the plaintiff was coming, and saw him down between the tender and the platform, scrambling to get out, and the step on the back of the tender struck him and rolled him right under the first box-car back of the engine. When he first saw the plaintiff he was between the platform and tender, his feet lying to the north and he was "kind of" on his stomach, with his head to the east, trying to get out. No one else saw the accident happen. The evidence showed that the outer edge of the step extended out a distance of thirty-three inches from the inside ball of the rail. The distance from the same place on the rail to the base of the tank was about twenty-eight inches. Thus the step extended out about five inches further than the base of the tank. These were actual measurements.

The first, second and fourth counts of the declaration contained the allegation that the sill-step on the tender was bent, twisted and out of place, and that was the defect complained of as rendering the tender unsafe to operate in the service to which it was put. On the last day of the trial, at the close of all the evidence, on motion of the plaintiff, without notice to the defendant, leave was given to amend the second count by striking out the words "was bent, twisted and out of place and the same," so that the allegation after the amendment read, "that said ladder, step

or foot-board on the rear of said tender then and there improperly extended out beyond the outside of said locomotive and tender away from said tracks and rails so that there was danger of the same striking and catching against objects and persons standing beside and adjacent to said tracks and rails." Counsel for the defendant, on account of the change of issue thus made, under which the plaintiff's attorney claimed and intended to, and did, argue, even if the step was not bent, twisted and out of place, as alleged, but was in its normal position, that the plaintiff was entitled to recover, was taken by surprise, and moved for a continuance until he could have the opportunity to call additional witnesses from other railroad companies to show that it was standard practice to have a step in that condition and position which extended out that far from the tank, and that it was proper, safe and customary to operate locomotives and tenders with steps projecting that far in their normal position, on all the railroads of the country prior to the happening of this accident. This motion was denied. It should have been allowed. Throughout the trial and until the evidence had all been heard and the cause was about to be submitted to the jury for its verdict, the trial proceeded on the theory that the cause of the accident was the fact alleged that the step was not in its normal position but was bent, twisted and out of place—on the theory, that is, that the step had been rendered defective because it had been bent and twisted out of place so as to be dangerous to persons and objects adjacent to the track. In no count of the declaration was any defect alleged in the original construction of the tender. In the first count the allegation was that the step "was twisted, bent and broken and the same was improperly and dangerously bent out and away from said tender so that there was danger," etc. The allegation of the second count has been quoted. That of the fourth was, that the step was "bent, twisted and extended out too far from the side of said tender." At

the beginning of the trial the plaintiff's attorney, in stating to the jury the case which he expected to prove, described the construction of this step as follows: "The particular step on this engine had been built sometime within two or three years prior to the happening of the accident, and consisted of a malleable iron rod or flat piece of steel approximately one-fourth to three-eighths of an inch thick and possibly an inch or an inch and a half or two inches wide, bent so that about six inches of it could be bolted to the under side of the sill; that there were about eighteen inches of this iron that hung straight down and was bent over to the bottom about eight inches, so that a wooden step eight and one-half inches wide could be bolted to it." In fact, as appeared later in the testimony of the plaintiff, there were two of these malleable iron hangers—one at each end of the step. Continuing his opening statement the plaintiff's attorney said: "At the time of this accident, early in the morning, when Auschwitz went out to look at this tender he found that the rear side of this tender was bent up backwards or a little forward but out about eight inches from the proper place; * * * and the ladder there was constructed so that it would hang straight down eighteen inches from the edge of the tender and then the foot-board would extend out eight inches; that the foot-board is built on the bottom and is about eight and one-half inches wide and about twenty-four inches long; that as Auschwitz looked at that he found that it was bent out so that the foot-board was probably out seven or eight inches beyond the point that it should be out." Auschwitz was then called as a witness and testified as his attorney said he would, and his was the only testimony tending to show the condition of the step as he testified it was. The defendant called a number of witnesses whose testimony was to the effect that the step and hangers were not bent or twisted; .that the hangers hung straight down from the sill and the step was not bent out. The record contains no other testimony in

regard to the step or the hangers. No allegation was made in the pleading and no claim was made in the evidence that a tender having a rear sill-step constructed in the manner described by the plaintiff's attorney in his opening statement and by the plaintiff in his description of the usual construction is not safe to operate in the service to which it may be put, without unnecessary peril to life or limb. Thus it is seen that the plaintiff's whole case, until the amendment of the declaration at the close of the evidence, rested on the foundation of a rear sill-step defective because of its bent and twisted condition causing it to extend beyond the side of the tender farther than it would in its normal position. The defendant had no notice to defend a case based on any other ground, and naturally when the amendment was made was not prepared with witnesses to show that the construction of the step was in the customary manner in general use by all railroads and that it was safe for operation without unnecessary peril to life or limb.

The case is to be determined, so far as the question now under consideration is concerned, as if the second count were the only one in the declaration. The jury was instructed that the question of whether or not the defendant was guilty of the negligence charged was for the determination of the jury upon all the circumstances and facts proved in the case. This included the negligence charged in the amended second count, that the step extended out beyond the outside of the locomotive and tender away from the track and rails, as well as the negligence charged in the other counts that the step was twisted, bent and broken and extended out too far from the side of the tender. At the same time the court refused an instruction asked by the defendant to return a verdict finding it not guilty under the second count, and another instruction "that the only charge of negligence on which this case is being submitted to you is that the defendant carelessly and negligently furnished, provided and maintained the tender of the locomotive in

question in a dangerous and defective condition in that the right, rear sill-step attached to the said tender was twisted, bent or broken and was then and there improperly and dangerously bent out and away from said tender so that there was danger of the same fouling or striking against persons and objects along and beside its tracks and rails as said locomotive and tender proceeded over the same. You are further instructed that the burden is on the plaintiff to prove said alleged negligence by the preponderance or greater weight of the evidence; and that if the plaintiff has not so proved his case, then you must find the defendant not guilty."

In the state of the present record these instructions should have been given. The evidence shows, without dispute, that the sill-steps were, as originally constructed, in compliance with the order and specifications of the Interstate Commerce Commission; that, as originally constructed, the tread itself projected out beyond the tank frame five inches, the other three and a half inches of its width being accounted for by the fact that the frame on which the tank rested projects beyond the tank itself and that the hangers go up behind this projection, and this brings the bracket that far in; that that was the normal position for the step on that type of engine and the only way the step could practically be put on. This brings the bracket three and a half inches inside the tank frame, leaving it to project five inches. The plaintiff himself stated the method of putting the step on, that the part of the engine that extended farthest out from the rails was the step on the rear end of the tank. Beyond the side of the tender and below the sills the step on the rear end extended out beyond the clearance line. It was about eight inches beyond the clearance line. They allow eight inches for that step. When he referred to "clearance line" he said he meant the widest part at the tender. He said: "I know how far that step should project out from the side. According to the Safety Ap-

pliance law it should be eight inches. That is the position it should be in if it is normal. That morning the step was bent out about seven or eight inches. I told the foreman about it that morning. I think the brakeman called my attention to it."

The defendant's duty was to keep the locomotives and tenders and their appurtenances in proper condition and safe to operate in the service to which they were put, so that they might be employed in the active service of the carrier without unnecessary peril to life or limb. The Federal Boiler Inspection act was passed to promote the safety of employees and is to be read and applied with the Federal Employers' Liability act. By the latter act the defendant was bound absolutely to furnish what before, under the common law, it was its duty to exercise ordinary care to provide. The carriers were left free to determine how their boilers and tenders, with their appurtenances, should be kept in proper condition for use without unnecessary danger. The things required for that purpose were not prescribed or changed by the act, though it conferred on the Interstate Commerce Commission the power to specify the sort of equipment to be used on locomotives in interstate commerce. It is a well established rule that the master is not bound to furnish the latest or best tools or appliances for the use of his servants, or to furnish the best mechanical contrivances and inventions, or to discard appliances upon discovery of later improvements, provided the tools, machinery, appliances and devices which are furnished are in proper condition and safe to operate, as required by the statute. Many mechanical questions are involved in determining the proper construction, maintenance and use of the boilers and other parts of locomotives and tenders and their appurtenances, all of which are covered by the Boiler Inspection act. Comparative merits as to safety or utility are most difficult to determine. It is not for the court to lay down rules which will operate to restrict the

carriers in their choice of mechanical means by which their locomotives, boilers, engine tenders and appurtenances are to be kept in proper condition, nor are such matters to be left to the varying and uncertain opinions and verdicts of juries. The interests of the carriers will best be served by having and keeping their locomotive boilers safe, and it may well be left to their officers and engineers to decide the engineering questions involved and the means to be used to that end, subject to the rules and specifications of the Interstate Commerce Commission. When the commission has, by order, prescribed rules and specifications in regard thereto, all that is required of the carrier to fulfill its duty in that respect is a strict compliance therewith. These principles are announced as the conclusions of the court, after a careful consideration of them, in the case of *Baltimore and Ohio Railroad Co.* v. *Groeger,* 266 U. S. 251.

So, also, was it decided in the case of *Ford* v. *McAdoo,* 231 N. Y. 155, a case also involving the Boiler Inspection act, in which *certiorari* was denied by the United States Supreme Court. (257 U. S. 641.) In that case the part of the tender claimed to be in violation of the act was a hook on the left side of the tender, twenty-three and a half inches back from the grab-iron on the front end of the tender. It was used to hang a water pail on. The employee's clothes got caught in it as he sought to alight from a moving engine. The court said: "There was nothing out of repair on this engine and tender. The hook was a mechanism devised by the American Locomotive Company, which manufactured the engine and tender. The water was drawn off into pails as emergencies arose while the train was in motion, for the purpose of cooling hot journals and the like. The man leaned down from the step of the engine, holding onto the grab-handle, hooked the pail onto the side of the tender, then by means of a valve at the top of the tank turned on the water. This device was in use upon many engines of the Delaware, Lackawanna and West-

ern Railroad Company and upon some of those of the Baltimore and Ohio. The locomotive-maker was a reputable concern of wide reputation as a locomotive builder, and the device was one which it had planned as giving the best service for the purpose. It was as much a part of the construction as was the grab-handle or side of the tender. This device had been in use for years without causing any accident. No danger had ever arisen from it. It had served its purpose and caused no harm, so far as the evidence in this case shows. The inspectors of the United States government under the act in question had examined this engine and tender and had passed them as complying with the law. It is true that upon other lines, such as the Erie, New York Central, Pennsylvania and Lehigh Valley, the water was drawn from inside the tank. But this system also had its objections. Sometimes the deck of the engine would become wet, the water freeze, and, standing, become slippery. The placing of the water opening at the side of the tender was a matter of engineering judgment. It may be that opinions vary as to the best method of procuring water from the tank for the purposes needed. Later inventions may make former uses inadequate. When it comes, however, to a question of proper condition and safety under the Boiler act, that mechanism which has been in constant use for years without causing injury must be considered proper and safe until some notice or occasion indicates its danger and insufficiency.—*Tuttle* v. *Detroit, Grand Haven and Milwaukee Railway,* 122 U. S. 189; *Chicago and Eastern Illinois Railroad Co.* v. *Driscoll,* 52 N. E. Rep. 921; *New York Central and H. Railroad Co.* v. *Banker,* 224 Fed. Rep. 351."

Another case is *Mahutga* v. *Minneapolis, St. Paul and Sault Sainte Marie Railway Co.* 234 N. W. 474, in which the action was brought by a head brakeman who fell from the cab of a locomotive, and the basis of it was a supposed violation by the railroad company of the Boiler

Inspection act. The Interstate Commerce Commission had made an order to equip engine cabs with side curtains of the character described in the order, providing also that the carrier might apply additional protective equipment not inconsistent with safety or the provisions of the order. It was the plaintiff's duty, while the train was in motion, to catch an order fastened to a hoop held up by the agent from the station platform. The train was traveling twenty miles an hour. The curtain was closed, and when the plaintiff tried to open it the wind blew it shut. He threw it forward so as to clear the grab-iron in front of and on the outside of the curtain, and as he reached for the grab-iron the wind forced the curtain back against his hand, so that he missed the grab-iron, fell to the station platform and was injured. The plaintiff's contention was that the railroad company violated the provisions of the Boiler Inspection act by failing to furnish a side curtain that was safe to operate without unnecessary peril to life or limb, and that it was not sufficient to save itself from liability to comply with the provisions of the rule of the Interstate Commerce Commission, but that the railroad company should have gone further and made provision for fastening the curtain back when it was open while the work the plaintiff in error was engaged in was being done. The Supreme Court of Minnesota in rendering judgment for the defendant said: "The Boiler Inspection act was adopted February 17, 1911, * * * conferred upon the Interstate Commerce Commission the exclusive power to specify the sort of equipment to be used on locomotives. It was given authority to standardize such equipment. * * * Our construction of the decision and order of the commission is that it intended to, and did, standardize the Wisconsin side curtain here used as suitable for all the purposes of the law, and it follows that a compliance therewith makes the locomotive 'safe to operate without unnecessary peril to life or limb.' The decision of this ultimate fact rests solely with the commis-

sion. A jury cannot be permitted to substitute its judgment in lieu of the judgment of the commission, upon whom the law places the responsibility for such determination. (*Southern Pacific Co. v. Berkshire*, 254 U. S. 415.) * * * The commission did not require the tie-back equipment. * * * Plaintiff is here attempting to have a jury say that .defendant is negligent in failing to install equipment in addition to that required by the commission. We think this cannot be done. We are of the opinion that when the carrier complies with the requirements of the Interstate Commerce Commission, as it has done here, and therefore the act of Congress, it cannot be found guilty of actionable negligence because the plaintiff or a jury might think ordinary care required something additional.— *Louisville, etc. Bridge Co.* v. *United States*, 249 U. S. 534; *Napier* v. *A. C. L. etc.* 272 id. 605."

The second count contained no allegation of any failure to comply with the requirements of the Boiler Inspection act. It alleged that the step extended away from the side of the tender, and the evidence was, without contradiction, that it was of the dimensions ordered by the Interstate Commerce Commission, was put in the position required in the only practical way for the purpose, with the result that it extended five inches beyond the side of the tender. The evidence showed, without contradiction, that the step, when constructed, was in compliance with the order of the commission and there was no evidence to show negligent construction. In that state of the record the court should have instructed the jury to find a verdict for the defendant on the second count, and should not have submitted to the jury, as it did by its instruction, the question of the negligence on that count but should have given the instruction on that subject requested by the defendant.

Counsel for the defendant have argued the facts in the case at considerable length and ask us to reverse the judgment without remandment, in accordance with a supposed

rule of law which they state as follows: That the testimony of a plaintiff, unsupported by any other evidence, contradicted by numerous witnesses and by documentary evidence, is insufficient to support a verdict or judgment in its favor. They argue that the Appellate Court ignored that rule and erred in so doing. Where two witnesses contradict one another, a question of fact is presented which can only be determined by weighing the evidence in the case, and the evidence consists not only of the testimony of the witnesses but all the circumstances in the case, including their opportunity for observation, their interest in the case, their manner on the witness stand, and a variety of circumstances difficult to enumerate, from all of which, taken together, the conclusion is to be reached whether the issue of fact has been established by the party having the burden of proof or not. That question is not within our jurisdiction to determine in a case at law which comes to us through the Appellate Court. Section 122 of the Practice act provides that the Supreme Court shall re-examine cases brought to it by appeal or writ of *certiorari,* as provided in the act, from the Appellate Courts, as to questions of law only; and in the cases aforesaid no assignment of error shall be allowed calling in question the determination of the inferior or Appellate Courts upon controverted questions of fact therein. One witness testifying one way, contradicted by another witness or a hundred, still raises a question of fact upon which the decision of the Appellate Court is final, and we have no jurisdiction to correct the Appellate Court's mistakes in such cases.

The judgments of the Appellate and the superior courts are reversed and the cause is remanded to the superior court of Cook county.      *Reversed and remanded.*