[Civil No. 4691. Filed April 23, 1945.]

[158 Pac. (2d) 142.]

THE APACHE RAILWAY COMPANY, a Corporation, Appellant, v. CHARLOTTE B. SHUMWAY, Administratrix of the Estate of Richard L. Shumway, Deceased, Appellee.

360

Mr. Earl Platt, and Mr. Guy Axline, for Appellant.

Mr. Dodd L. Greer, Mr. David P. Jones, and Mr. Clifton C. Hildebrand, for Appellee.

MORGAN, J.—The plaintiff as administratrix of the estate of her husband, Richard L. Shumway, brought this action under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 *et seq.*, to recover damages on account of injuries and the death of deceased while employed as a brakeman for the defendant, Apache Railway Company. The case was tried before a jury, resulting in a verdict for $12,500 in favor of plaintiff, for which judgment was entered. It was alleged in the amended complaint, and admitted by defendant, that both the deceased and defendant were engaged in interstate commerce at the time of the injuries to the deceased, and it was also conceded that deceased was engaged in the regular scope of his duties as a brakeman at the time of the accident.

The facts alleged which pertain directly to the claimed negligence were as follows: Decedent was climbing down from the brake platform of an 81,000 series gondola car which was so carelessly and negli-

gently maintained and equipped as to cause the deceased to encounter an obstruction to his footing, as a direct and proximate result of which he was caused to, and did, sustain the injuries which resulted in his death. The obstruction which caused decedent to fall consisted in the placing of the uncoupling lever on top of and over the end sill of the car, thus failing to provide the customary footing maintained for the safety and convenience of trainmen on such cars. The 81,000 series cars are unlike all other similar gondola cars in that in other such cars of different series the uncoupling levers are placed under the end sill.

The defendant put in issue the facts so alleged; it also challenged the sufficiency of the amended complaint by motions to dismiss, and for summary judgment. At the close of the evidence the defendant moved for a directed verdict in its favor, and for a similar verdict at the close of the whole case. Following the judgment, motion was made by the defendant to vacate and set aside the verdict and judgment, and to have judgment entered in its favor. Motion for new trial was also seasonably filed. For all practical purposes these motions raised only one question, and the position of defendant may be summarized as follows:

The uncoupling lever so constructed and placed on the top of and over the end sill fully complied with the Safety Appliance Act of Congress, and with the orders, rules and regulations of the Interstate Commerce Commission. No defect in the equipment was alleged or shown. Compliance with such act and orders of the commission constitutes, as a matter of law, the reasonable care required to furnish the employee with a safe place to work, and absolve the defendant from all liability. Equipment so placed is deemed safe to operate and the decision of such ultimate fact rests solely with the commission, and the jury cannot be permitted to substitute its judgment in lieu of the judgment of the commission upon whom the law places the re-

sponsibility for such determination. All these motions were denied by the court.

The defendant appears here as appellant, the plaintiff as appellee. Throughout this opinion the parties will be referred to, respectively, as plaintiff and defendant.

Briefly the facts adduced at the trial are as follows: The accident happened on March 26, 1942, between 8:30 and 9 o'clock in the evening. The deceased was an experienced, capable trainman. He had assisted in running a train for defendant from Holbrook to McNary. When the train arrived at McNary it was necessary to switch cars. The tracks at that point ran in a northerly and southerly direction. The gondola car was disconnected from the other cars and "kicked" in a northerly direction onto track number 4. The deceased uncoupled this car and rode it a short distance to set the brake. The car was stopped on the easterly side of a loading platform approximately 6 feet high, with a clearance of approximately 8 inches between the platform and car. The brake was located to the left end center of the car and towards the side of the car next to the platform. To apply the brake, the deceased had to stand on the platform about 2½ feet above the sill. The uncoupling lever was placed on the top of this sill, running from near the left end of the car to the center directly under the brake platform. This uncoupling lever consists, for practical purposes, of one piece—the handle on the end, a round iron rod approximately one inch in diameter that runs along the sill to the pin lifter at the center end of the car. This pin lifter extends from the sill out over the coupler, and when operated to disconnect the coupler rises above the end sill and interferes with the footing. The maintenance of the cut lever on top of the sill obstructs the footing. The round iron rod tends to cause the foot to turn when stepped upon. The type of car

originally constructed with the cut lever on top of the end sill over a period of years was being reconstructed, the lever being removed from the top and placed either at the end of, or underneath, the end sill. The maintenance of the lever on top of the end sill was uncommon, and no new equipment was being so constructed. After deceased had completed setting the brake, in order to alight it was necessary for him to step down onto the end sill. The westerly or left side of the car was within eight inches of the unloading platform, and it was, therefore, impossible for deceased to use the westerly grab irons. He had to jump either from the end sill of the car or cross it over the lever and pin lifter and climb down on the easterly stirrups or grab irons with which the car was equipped. He either hung his heel in or tripped on the pin puller or pin lifter, and was thrown from the car, sustaining injuries from which he later died. The deceased was survived by his widow and five children, all of whom were dependent upon him.

The pertinent portion of the Federal Employers' Liability Act, under which this action was brought, 45 U. S. C. A. § 51, provides as follows:

"Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, tract, roadbed, works, boats, wharves, or other equipment."

The plaintiff's position is that her complaint and proof discloses that the operation by the defendant of a car equipped with an end sill obstructed by the use of the uncoupling lever, as alleged in the complaint and shown by the evidence, constituted negligence. This on the theory that since the deceased was required to

use the end sill of this car and the device obstructed the footing, he was not furnished a safe place to work, and, therefore, the defendant was guilty of negligence.

The defendant, however, contends that the device referred to was standard equipment, complying with the United States Safety Appliance Standards Act, and with the rules and regulations of the Interstate Commerce Commission, particularly in compliance with its order of March 13, 1911, and that, therefore, as a matter of law the defendant cannot be held liable. The effect of this contention is that even if it be conceded that the device so maintained created a hazard and an unsafe place to work, since the commission authorized its placement on the top of the sill, the defendant used reasonable care in furnishing or using a car so equipped.

Title 45 U. S. C. A. § 2, pertaining to automatic couplers, reads as follows:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The order of the commission on March 13, 1911, relied upon by defendant, gives rather complete specification for uncoupling levers. The specifications are found on page 8, under "Box and other house cars." The specifications do not state on what part of the car sill the uncoupling lever is to be attached. For gondola cars the specifications for uncoupling levers are the same as specified for "Box and other house cars," page 9. The specifications do, however, refer to Plate B, page 36. On page 41 we find plate F giving drawing for high-side gondola cars of the type involved in this case. This plate also refers to plate B for arrangement of uncoupling attachment. Plate B

provides for the application of uncoupling attachment either on top of the sill, on the end of the sill, or under the sill.

 It is unquestionably the law that where the Interstate Commerce Commission has the power to standardize certain railroad equipment as suitable, a compliance with such order makes the equipment safe to operate. If the equipment is in no way defective, a jury cannot be permitted to substitute its judgment in lieu of the judgment of the Interstate Commerce Commission. *Atchison T. & S. F. Ry. Co.* v. *Scarlett*, 300 U. S. 471, 57 Sup. Ct. 541, 81 L. Ed. 748; *Satterlee* v. *St. Louis-San Francisco Ry. Co.*, 336 Mo. 943, 82 S. W. (2d) 69; *Western & Atlantic R. R. Co.* v. *Gentle*, 58 Ga. App. 282, 198 S. E. 257; *Auschwitz* v. *Wabash Ry. Co.*, 346 Ill. 190, 178 N. E. 403; *Mahutga* v. *Minneapolis, St. P. & S. S. M. Co.*, 182 Minn. 362, 234 N. W. 474; *Central Vermont Ry. Co.* v. *Perry*, 1 Cir., 10 F. (2d) 132; *Erie R. Co.* v. *Lindquist*, 3 Cir., 27 F. (2d) 98; *Baltimore & O. R. Co.* v. *Groeger*, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. Ed. 419; *Napier* v. *Atlantic Coast Line R. R. Co.*, 272 U. S. 605, 47 Sup. Ct. 207, 71 L. Ed. 432. Plaintiff concedes this to be the law and points out that the issue for determination was not whether the device was maintained by defendant in violation of the Federal Safety Appliance Act, but whether the operation by the defendant of the car equipped with an end sill obstructed by the use of such a device, constituted negligence. This narrows the issue for our consideration.

 It is the duty of a carrier to exercise reasonable care to provide a safe place for its employees to work. Failure to use such care constitutes actionable negligence. *Bailey* v. *Central Vermont Ry. Co.*, 319 U. S. 350, 63 Sup. Ct. 1062, 87 L. Ed. 1444; *Smith* v. *Schumacker*, 30 Cal. App. (2d) 251, 85 Pac. (2d) 967; *Thomas* v. *Southern Pac. Co.*, 116 Cal. App. 126, 2 Pac. (2d) 544;

*Haskins* v. *Southern Pac. Co.*, 3 Cal. App. (2d) 177, 39 Pac. (2d) 895; *Baltimore & O. R. Co.* v. *Flechtner*, 6 Cir., 300 Fed. 318; *Baltimore & O. R. Co.* v. *Kast*, 6 Cir., 299 Fed. 419; *Southern Pac. Co.* v. *Huyck*, 61 Nev. 365, 128 Pac. (2d) 849.

█ The decision of the Supreme Court in *Bailey* v. *Central Vermont R. Co.*, *supra* [319 U. S. 350, 63 Sup. Ct. 1063], admirably sets out the rules concerning the duty of a carrier under the act to furnish a safe place to work:

"There was in our view sufficient evidence to go to the jury on the question whether, as alleged in the complaint, respondent was negligent in failing to use reasonable care in furnishing Bailey with a safe place to do the work.

"Sec. 1 of the Act makes the carrier liable in damages for any injury or death 'resulting in whole or in part from the negligence' of any of its 'officers, agents, or employees.'

"The rights which the Act creates are federal rights protected by federal rather than local rules of law. (Citing cases.) And those federal rules have been largely fashioned from the common law (citing case) except as Congress has written into the Act different standards. (Citing case.) At common law the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain. (Citing case.) That rule is deeply engrained in federal jurisprudence. (Citing cases.) As stated by this Court in the *Patton case* [*Patton* v. *Texas & P. Ry. Co.*, 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361] it is a duty which becomes 'more imperative' as the risk increases. 'Reasonable care becomes, then, a demand of higher supremacy, and yet, in all cases it is a question of the reasonableness of the care, reasonableness depending upon the danger attending the place or the machinery.' (Citing case.) It is that rule which obtains under the Employers' Liability Act [45 U. S. C. A. § 51 *et seq.*] (Citing cases.) That duty of the carrier is a 'continuing one.' "

In the present case the verdict of the jury is tantamount to a fact finding that the defendant failed to use reasonable care in furnishing the deceased a safe place to work, and that the maintenance of the uncoupling lever on the top of the sill was a hazard to the footing, making it an unsafe place for the performance of the employee's duties.

 Does the standardization order of the Interstate Commerce Commission relieve the defendant from liability? The rule that there can be no recovery for injuries growing out of the use or maintenance of standardized equipment prescribed by the commission is founded upon the fact that the commission has statutory authority to standardize certain railroad equipment. All of the cases which have been referred to holding that there can be no liability, as already stated, grew out of claims that equipment such as steps, brakes, ladders, and other items specifically covered by the Safety Appliance Acts have been standardized by the commission.

 We have made a rather complete examination of the Safety Appliance Acts and do not find anywhere that the Interstate Commerce Commission was given the power or authority to designate the number, dimensions, location and manner of application of uncoupler levers. It has done this, however, and in general there has been a compliance with its orders in this respect. Notwithstanding this, they do not, in our judgment, become a part of the law since the action of the commission was in excess of the authority delegated to it by the Congress. While it is true that the regulations of the commission have the force of law where its orders standardize the appliances mentioned and specified in the statute, and a compliance with that standard establishes the equipment as suitable for all purposes, does it follow that where it standardizes other equipment not specifically covered by the statute,

will compliance with such order relieve the railroad from liability? Apparently no case has ever decided this point. On principle, it would seem, however, that if the commission, without statutory authority, standardizes and directs the placing of equipment on a car in such a position as to make it hazardous to trainmen, or those who have to use the car, the railroad would not be relieved from liability. Relief from negligence cannot be contracted away. The sovereign, in this case the Congress, could and did, from the decisions which we have referred to, relieve railroads from all liability in the use of certain standardized and undefective appliances. The Commission, however, went far beyond the terms of the act in standardizing equipment not therein mentioned. The decisions to date as already stated, hold only that a compliance with the orders of the commission, by using standardized equipment as mentioned in the act, relieves a railroad from responsibility. If the Congress had wished to give this power of standardizing all appliances to the commission, and thus relieve railroads from responsibility in following its orders, it would have been wholly unnecessary to specify certain items such as brakes, handholds, ladders, *et cetera,* and we therefore conclude that freedom from responsibility exists only with respect to the appliances specified in the act which have been so standardized.

Roberts, in his work on Federal Liability of Carriers, vol. 2, pages 1051–1052, points out that the commission in its order of March 13, 1911, included numerous specifications touching the number, dimensions, and location of levers for releasing automatic couplers which were not covered and included under the Safety Appliance Acts. These acts appear in 45 U. S. C. A. §§ 1 to 46, inclusive.

The power given to the commission to standardize appliances is found in 36 U. S. Stat. 298, chap.

160, 45 U. S. C. A. §§ 11–16. The title to the act reads as follows:

"An Act to supplement 'An Act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving wheel brakes and for other purposes,' and other safety appliance Acts, and for other purposes."

In the body of this act, however, no mention is made of automatic couplers. Section 2 of the act imposes a duty upon railroads to maintain secure sill steps, efficient handbrakes, running boards, ladders, handholds and grab irons. Section 3 then gives the commission the power to designate the number, dimensions, location and manner of application of the appliances provided for by Sec. 2 of the act, and Sec. 4 of the act of March 2, 1893, now 45 U. S. C. A. § 4. This act merely applies to grab irons or handholds. The commission was also given specific authority to change and to prescribe the standard height of draw bars. The act does not refer to nor cover Sec. 4 of the act of March 2, 1893, now appearing as 45 U. S. C. A. § 2, relating to automatic couplers. In its order of March 13, 1911, the commission recites the title of the act of April 14, 1910, above quoted.

Evidently the commission was under the belief that this title was a grant of power to standardize all railroad appliances. The rule of law, however, is otherwise. The title is no part of the granting powers of the act, and may be referred to only in cases where the legislative or congressional meaning is left in doubt, that is, where the statute itself is ambiguous. *Strathearn S. S. Co.* v. *Dillon*, 252 U. S. 348, 40 Sup. Ct. 350, 64 L. Ed. 607; *Maguire* v. *Commissioner of Internal Revenue*, 313 U. S. 1, 61 Sup. Ct. 789, 85 L. Ed. 1149; 50 Am. Jur. 299–300, Secs. 311–312, title "Statutes." A reading of the act of April 14, 1910, discloses

no ambiguity. The statute is clear and specific and covers, as already stated, only certain specified appliances. The title to the act, therefore, cannot be relied upon to extend by implication or otherwise the powers clearly and specifically given to the commission in the act itself.

Even on the assumption that the commission had power to standardize uncoupling levers so as to make its order a part of the Safety Appliance Act, it would seem that the defendant would not be justified by the order in the placing of the lever on the top of the sill. A close examination of the order of March 13, 1911, and the various plates, leaves us in doubt as to just what the commission intended. It provided generally for the placing of uncoupling levers either on the top of the sill, on the end of the sill, or underneath. It did not, in terms, authorize railroads to place these levers in such a position as to make footing for their employees hazardous.

We may well assume that in all cases, particularly pertaining to gondola cars where brakemen and others had to use the end sill, it was the intent of the commission that the levers should be attached to the end of the sill rather than to the top. It must be borne in mind that plate B designating uncoupling levers has general application to freight cars. In the case of box cars, for instance, the end sill is never used by brakemen or others, and it is perfectly proper and creates no hazard to place the uncoupling lever on the top of the end sill of the box car. The brakemen have to go over the top of the car to set the brake, or to go from one side of the car to the other. A gondola car has no top and it is, therefore, necessary for the trainmen, both in setting the brake or going from one side of the car to the other, to use the end sill. Even if the railroads had an option, it would appear to us that they would be required to place the lever in such position

as not to create a hazard. The maintenance of the lever in a place where, from the finding in this case, it did create a hazard and an unsafe place to work, would constitute actionable negligence.

The duty of a master to provide his servant with a safe place to work and to exercise reasonable care in making the place of work safe is a principle of law which has the sanctity of age and the approval of mankind generally. The rule has always been enforced by the courts in proper cases. It is engrained in the law of negligence. We cannot believe that the Congress ever intended when it gave power to the commission to adopt standards that the placing of such equipment in such a position as to make it a hazard for employees would free a carrier from negligence. In other words, that if such an appliance was placed in a position which rendered the servant's place of work unsafe the railroad would thereby be released. So far as we can find, no such holding has ever been made by any court. The cases which have heretofore been referred to as establishing the rule of non-liability apply only to the use of the particular standardized equipment. There has been no holding or decision to the effect that if either under the safety appliance acts, or the order of the commission, the approved appliance is maintained in such a manner as to make the place upon which a trainman has to work unsafe, the carrier is relieved from liability and the case is not one for the jury.

The case of Satterlee v. St. Louis-S. F. Ry. Co., *supra,* cited by the defendant in its brief, supports the view which we have just expressed. In that case the employee, a brakeman, brought action under the provision of 45 U. S. C. A. § 22 *et seq.,* ''The Locomotive Safety Act.'' The gist of the complaint was that the rear end of the tender and its appliances was not safe for use. The facts disclosed that it was necessary

to use the sill of the tender, and that this sill was obstructed by the automatic coupling rod along it some 5 inches higher than the rear of the tender sill which had to be used as a walkway. The coupling rod complied with the standard set up by the commission. Notwithstanding this, the court held that inasmuch as this rod and other items of equipment obstructed the sill and passageway, it was a question for the jury whether it was a safe place to work. We quote from the opinion [336 Mo. 943, 82 S. W. (2d) 76]:

" . . . In fact, we are impressed with the idea that this tender and its safety appliances was not constructed and equipped with a view to safety with this 'doghouse' constructed on top of same for the almost constant use of the head brakeman, inviting, if not requiring, him to reach same by mounting the tender while in motion at the right rear corner and then using the narrow sill of the tender as a walkway to reach the ladder leading to the top. As shown by the picture of the tender, the automatic coupling rod extended along there some five inches higher than the rear of the tender sill used as a walkway. . . . "

It is our considered opinion that the law which has been invoked by defendant does not preclude the jury from determining whether reasonable care was used in furnishing the deceased a safe place to work. The order standardizing uncouplers was not specifically authorized by the acts of Congress. It cannot be relied upon as a part of the law. Under the regulations carriers were not required to place or use uncoupler levers on the top of the sill where they might create a hazard to footing. They could be placed either at the end of, or below, the sill. It would seem to us, therefore, to be a question of fact whether a carrier, in equipping and using a car with the uncoupler maintained on top of the sill, is exercising reasonable care. Finally, the law and the regulations cannot be so construed as to authorize the maintenance of equipment

in a position which will destroy the safety of the place the employee must work. Such a rule would defeat the whole purpose of the standard safety appliance acts. The object of all these acts is safety. To hold that a standardized appliance may be so placed as to create an unnecessary hazard to the employees of the carrier would be directly opposed to the congressional intent.

The decisions of the Supreme Court of the United States support our view that the question here was one for the jury. In 1939 the Federal Employers' Liability Act was amended by doing away with the "assumption of risk" doctrine in certain cases. Following that amendment, the Supreme Court of the United States, in *Tiller* v. *Atlantic Coast Line,* 318 U. S. 54, 63 Sup. Ct. 444, 451, 87 L. Ed. 610, 143 A. L. R. 967, laid down the rules governing negligence cases under the statute, and pointed out that when questions of due or reasonable care are involved, where different inferences may be drawn from the facts, the issue is one for the jury. We quote from the opinion:

" . . . The Act of 1908 and the amendment of 1939 abolish the *post-Priestley* v. *Fowler* [3 Mees. & W. 1, 150 Eng. Reprint 1030, 19 Eng. Rul. Cas. 102] defenses and authorize comparison of negligence instead of barring the employee from all recovery because of contributory negligence. They leave for practical purposes only the question of whether the carrier was negligent and whether that negligence was the proximate cause of the injury.

"In this situation the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done. A fair generalization of the rule is given in the Senate Committee report on the 1939 amendment: 'In jus-

tice, the master ought to be held liable for injuries attributable to conditions under his control when they are not such as a reasonable man ought to maintain in the circumstances.' Of course in any case the standard of care must be commensurate to the dangers of the business. (Citing cases).

''No case is to be withheld from a jury on any theory of assumption of risk and questions of negligence should under proper charge from the court be submitted to the jury for their determination. Many years ago this Court said of the problems of negligence, 'We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others.' (Citing case.) Or as we have put it on another occasion, 'Where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences,' the case should go to the jury.''

The gist of the negligence charged to the defendant here is the impairment of footing through the maintenance of the uncoupling lever making the place upon which he had to work unsafe.

The decision of the Supreme Court of the United States, in Atchison, T. & S. F. Ry. Co. v. Scarlett, *supra,* supports the conclusion which we have expressed. In that case the testimony disclosed that under the U. S. Safety Appliance Standards, a minimum clearance for treads of 2 to $2\frac{1}{2}$ inches from the side of the car was required. Brace rods were placed in the wall or side of the car under the ladder treads in such a manner as to extend outwardly a distance of more than an inch. These brace rods were not a part of the ladder, and therefore no action could be maintained on the ground that the ladder was defective. The court held the brace rods were authorized appliances, and stated that the whole question was whether the two appliances were maintained in such relation to one another as to constitute negligence on the part of the

company. We quote from the decision [300 U. S. 471, 57 Sup. Ct. 543]:

"We do not see how it reasonably can be said that the brace rod constitutes a part of the ladder. In itself, it was a contrivance separate and distinct from the ladder, designed and used for a purpose entirely apart from the use of that appliance. The right of recovery, if any, must therefore rest upon the effect of the near proximity of the ladder to the rod, neither being in itself defective. The law to be applied to that situation is the common-law rule of negligence, and not the inflexible rule of the Safety Appliance Act; and the questions to be answered are whether the two appliances were maintained in such relation to one another as to constitute negligence on the part of the company and, if so, whether Scarlett assumed the risk. (Citing cases.) In that view, Scarlett in abandoning his claim under the common-law rule of negligence abandoned the only possible ground of recovery."

When the case was returned to the California court, that court allowed the plaintiff to proceed on the theory of common-law negligence, as suggested by the Supreme Court. See *Atchison, T. & S. F. R. Co.* v. *Superior Court,* 12 Cal. (2d) 549, 86 Pac. (2d) 85. Upon the refusal of the Supreme Court of California to issue a writ of prohibition, the case was taken by writ of *certiorari* to the Supreme Court of the United States. The writ was denied. *Atchison T. & S. F. Ry. Co.* v. *Superior Court,* 306 U. S. 657, 59 Sup. Ct. 774, 83 L. Ed. 1055. By denying the writ of *certiorari,* the court indicated satisfaction with its former view that where two standardized or approved appliances are maintained in such relation to one another as to constitute negligence on the part of the defendant, recovery may be had.

The only remaining question is as to proximate cause. The evidence admitted tended to show that deceased tripped on the lever. The jury found that the proximate cause of the accident was the neg-

ligent maintenance of the cutting lever over which deceased tripped. The decision of the Supreme Court of the United States in *Tennant* v. *Peoria & P. U. R. Co.,* 321 U. S. 29, 64 Sup. Ct. 409, 411, 88 L. Ed. 520, holds that the jury finding forecloses all questions as to this. All that is required in negligence cases is for the plaintiff to present probative facts from which negligence and the causal relation may be reasonably inferred: .

" 'The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.' (Citing cases.) If that requirement is met, as we believe it was in this case, the issue may properly be presented to the jury. No court is then justified in substituting its conclusions for those of the twelve jurors.

" . . . It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. (Citing cases.) That conclusion whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

We deem it unnecessary to discuss the duties of the defendant with respect to the inspection of exchange cars received from a connecting carrier. The conclusions which we have heretofore expressed dispose of the respective claims of the parties. The rule is that a railroad is not liable for injuries to employees caused by a defective car received from a connecting carrier unless it fails to properly inspect it, or, having so inspected it and found it defective, has put it in its

train. Here the defendant urges that since the car was properly inspected, and no defect within the law existed, there can be no recovery. The plaintiff asserts that even a casual inspection would have disclosed that the uncoupler located on the top of the end sill was a defect requiring defendant to remove the car, and that this constitutes negligence. If, as the jury found, the maintenance of the uncoupler on the top of the sill made it unsafe for the deceased to perform his labors there, the inspection rule would be no defense. The inspection did not remove the hazard. The risk was not assumed by the employee. *Tiller* v. *Atlantic Coast Line, supra;* 45 U. S. C. A. § 54. On the other hand, the plaintiff's case is based on the failure of defendant to provide the deceased a safe place to work. Whether the defendant was free from, or guilty of, negligence under the inspection rules is, therefore, immaterial to the inquiry.

In our view of the law, the case was one for the jury and we are bound by its findings. The judgment is affirmed.

STANFORD, C. J., and LaPRADE, J., concur.